**UNITED STATES v. LEVY.**
**UNITED STATES v. LICHTER et al.**
(two cases).

**Cr. Nos. 8410–8412.**

United States District Court
D. Connecticut.

June 15, 1951.

. Theron Lamar Caudle, Asst. Atty. Gen., Meyer Rothwacks and John Lockley, Sp. Assts. to Atty. Gen., Adrian W. Maher, U. S. Atty. for Dist. of Connecticut, New Haven, Conn., for plaintiff.

Gerald L. Wallace and Gordon L. Bazelon, Old Greenwich, Conn., for defendants.

HINCKS, Chief Judge.

On September 19, 1950, a grand jury returned indictments charging defendants with evasion of taxes of the Harlic Bag Company, Inc., for the years 1944, 1945, and 1946; defendants Joseph A. Lichter and Oscar Druks with evasion of individual taxes of Lichter for the years 1944 to 1947; and defendant Arthur A. Levy with evasion of his individual income taxes for the years 1944 to 1947, all in violation of Section 145(b), Internal Revenue Code, 26 U.S.C.A. § 145(b). On October 16, 1950, the defendants pleaded not guilty to the charges. Separate petitions to suppress evidence and dismiss indictments were filed in each case on December 8, 1950, and separate answers were made on April 17, 1951. These petitions sought to suppress evidence given by the voluntary disclosures of the defendants, it being their contention that the disclosures had been made in reliance upon the declared policy of the government to forego criminal prosecutions for violation of the revenue laws in cases in which income had been intentionally understated provided timely disclosures of the delinquencies were voluntarily made in behalf of the taxpayers. And so their basic claim rested upon the proposition that their disclosures, thus induced by promises of immunity, did not operate as waivers of their constitutional protection against self-incrimination under the Fifth Amendment with the result that the information derived from the disclosures was inadmissible.

In the course of the hearing held on the petitions on April 17 and 18, 1951, the court, "as a matter of trial convenience and a possible economy of time," with the consent of the parties, rule as follows: "that the issue as to the efficacy of a disclosure made on June 9, 1947, assuming such a disclosure was made, shall be separated from

any other issues raised by the pending petitions and shall be developed for final submission in advance of other issues, hearing on which will be deferred until after the ruling on the issue just defined." The submission of the specified issue was completed accordingly and upon that issue I find the following facts:

### Facts.

The Harlic Bag Company, Inc., was engaged during the relevant taxable years and for some time previously in the manufacture and sale of a line of ladies' handbags retailing at low prices. Its factory was located in South Norwalk, Conn., and a sales office was maintained in New York City.

During the period covered by the questioned returns the defendant Arthur Levy, residing in Stamford, Conn., was the Treasurer of the corporation and owned fifty per cent of its stock. The defendant Joseph A. Lichter, residing in Norwalk, was and still is the President of the Corporation, and during the taxable years and previously owned the other fifty per cent of its stock. The defendant Oscar Druks, residing in Norwalk, was employed by the corporation as its general manager.

Beginning in 1943 and continuing into 1946, the defendants Levy and Lichter sold a special line of leather handbags to Ben D. Levine (Mirro Handbag Company) of Chicago, Ill. These were manufactured exclusively for Levine with materials purchased in the black market by the defendant Levy. Levine paid for the finished bags in currency, a substantial part of which was used to buy the leather and other materials used in their manufacture. The balance was divided between Levy and Lichter.

The transactions described in the preceding paragraph were not entered on the corporate books, and were not contained in any records kept by the individual taxpayers. The profits derived from these transactions with Levine were not reported in the original returns filed by the corporation or in the individual returns filed by Levy and Lichter for the taxable years 1944–46.

In December of 1946, Levy retired from the business of the corporation and thereafter had no personal connection with it. On May 2, 1947, he sold all of his stock to the corporation. Since that date, Lichter has owned substantially all of the stock.

On May 16, 1947, the defendant Lichter received a telephone call at the New York office of Harlic from a revenue agent named Richard Duffy, who had a "Form 917" assigned to him by his superior in the office of the Internal Revenue Agent in Charge in the Upper District of New York. This form required an inquiry about an insurance policy which Lichter had purchased in December of 1943 for a single cash premium of some $11,000. At the time of this inquiry, Duffy had information only that the purchase was a cash transaction: he did not know whether the payment had been made in currency or by check. In fact, Lichter had paid the sum stated in currency to the agent who wrote the insurance, who in turn paid it over to the insurer by the check of his agency. Upon learning that Lichter's return had been filed in Connecticut, Duffy so reported to his superior officer in New York, who, without obtaining any further information relating to the case, forwarded the Form 917 to Doyle, Internal Revenue Agent in charge in New Haven (not to the Intelligence Unit having jurisdiction of Connecticut returns), who received the same on July 17, 1947. The subsequent course of the Form is not material to the issue submitted as to the efficacy of a claimed disclosure on June 9, 1947.

On March 18, 1947, the Harlic returns (Forms 1120 and 1121) for the taxable year 1944, in the usual routine, were assigned out of the Bridgeport office to Revenue Agent Whelan for a routine examination. Whelan was not a member of the "fraud section," to which under departmental practice cases of suspected fraud were assigned for intensive investigation. On March 31, 1947, Whelan had in his possession the returns of more than forty taxpayers, including Harlic, the examination of which in the usual course would require an aggregate of about four months' work.

Whelan merely scanned the 1944 Harlic returns and did not at any time commence his examination. Nothing out of the ordinary was suggested by his study of the returns themselves, and he had no other information indicating that the returns required anything beyond the usual routine type of examination, which would have involved only a verification of the returns by checking them against the books and records kept by the corporation. Under the usual practice, in the absence of suspicious circumstances, any cash transactions not reflected on the books would not have been covered by the audit. And, as was implicit in the record now before me, there was nothing in the defendants' books and records that even pointed toward the delinquency which was the subject matter of the disclosure in question. None of the returns involved were assigned to the fraud section for investigation prior to June 9, 1947.

There was testimony that Whalen, on May 23, 1947, by telephone informed Harlic's office that he had its 1944 return for examination. This call was disputed by the defendants. In the view which I take of the case there is no need to solve this conflict: for present purposes I assume that on June 9, 1947, the defendants had no knowledge that any of the tax returns involved had been assigned for examination.

On June 3, 1947, a lawyer, to whom the defendants had disclosed, at least in general outline, their tax delinquency, and whom they had retained to assist in making voluntary disclosures, informed the Norwalk collector in charge, without mentioning any names, that clients desired to make a disclosure of understated income in a very substantial sum. As a result, a conference was held on June 9, 1947 with Agent Johnson of the fraud section of the Bureau at which defendants' lawyer disclosed their names and the fact of a substantial delinquency growing out of their transactions with Levine. At that conference, the statement of J. P. Wenchel, Chief Counsel of the Bureau, defining the Bureau's policy in cases of voluntary disclosures was read to him. That statement had been made in a speech at a public din-

ner of tax executives on May 14, 1947, and had been highly publicized. It plainly, in unequivocal language limits the departmental policy to forego criminal prosecutions to cases in which voluntary disclosures have been made before an "investigation" has been initiated. And it provides that "an investigation is initiated when * * * an Internal Revenue Agent * * is assigned a return for examination * * *". It is not necessary for me to decide from the evidence herein whether the lawyer knew of the statement either when he advised his clients to disclose or on June 9th when he made the disclosure in their behalf: the only reasonable inference is that the statement was available and I hold that the defendants are bound to have known its existence and contents.

### Conclusion of Law.

■ I hold that the investigation in this case was initiated when the Harlic 1944 return was assigned to officer Whalen for examination on March 18, 1947, and that the disclosures were not timely within the purview of the official policy which is defined in the Wenchel statement of May 14, 1947.

### Opinion.

■■ It is true that Harlic is not a defendant herein, but beyond dispute Harlic was the vehicle through which the defendants had perpetrated their fraud and their fraud was such that a discovery of Harlic's participation in the fraud would necessarily lead to the uncovering of the defendants' participation. The official definition states that a disclosure to be voluntary within the reach of the policy defined must be made before "we have initiated an investigation *in the case.*" (Italics supplied). This is broader language than an investigation limited, for example, *to the return of the taxpayer making the disclosure*: that its breadth of scope was indeed intended is corroborated by an earlier excerpt from the Wenchel statement, viz., "A voluntary disclosure occurs when a taxpayer of his own free will and accord, and before *any investigation* is initiated, etc.". (Italics supplied). It is noted that here too the prerequisite of the investigation is not that

it shall be that of a specified tax return of a specified taxpayer: the initiation of *any* investigation is specified and the only words of limitation used are those of the later paragraph, above quoted, which provides that to be considered voluntary for purposes of the official policy, the disclosure must be made before the initiation of an *investigation in the case*.

The defendants contend that the definition of the departmental policy should be interpreted to mean that the time for voluntary disclosures is terminated not by an assignment of a return for routine examination, as in this case, but upon the initiation of a fraud investigation which under departmental practice begins only if and when a return is assigned to the fraud section upon the uncovering, either in the routine examination or from other sources, of information indicative of fraud. They point out that an assignment for examination is an intra-departmental piece of routine of which the taxpayer has no knowledge. From this, they argue that a policy limited to a disclosure before the routine assignment would fail to achieve the objective sought in that taxpayers desiring to avail themselves of the policy could not know whether a present disclosure would be timely and hence would fail to disclose.

This contention cannot be sustained as sound basis for the interpretation sought. True, an occasional delinquent may withhold a disclosure because, without knowledge that no assignment of his return has been made, he cannot be sure that he will earn the immunity afforded by official policy. But substantially the same result would occur if an assignment of the return to the fraud section were the event which terminated the "tempus penitentiae": such an assignment is no more within the knowledge of the delinquent than the initial routine assignment. And thus the defendants in logic are forced to the extreme position that the official definition

should be expanded to mean that any disclosure will be timely if made before the delinquent has knowledge that his return has actually been assigned to the fraud section. That a policy of such scope would achieve the objective of bringing in more revenue with less expense is far from plain: it might well have the effect of inducing a delinquent to believe that he could safely await developments in the routine examination and then make a disclosure, in anticipation of an assignment to the fraud section, only if his observation of the course of routine examination gave him cause to fear that his exposure was imminent. If such a course were permissible, a loss of revenue might result from disclosures never made which otherwise would have been forthcoming. It is altogether reasonable to infer that the Wenchel definition was formulated because the Bureau saw the unwisdom of providing a *tempus penitentiae,* the boundaries of which depended upon an absence of knowledge of an investigation begun or imminent,—a negative fact so easy for a delinquent to simulate and so hard for the Bureau to dispute.[1] And that the Bureau has power to broaden or narrow its policy as to disclosures thereafter made is too obvious to need demonstration. I have no power under the guise of interpretation to extend the official policy. And I am far from satisfied that the plain language of the official statement of the policy was intended to cover a disclosure such as this made after the routine assignment of the return.

In support of their claim in this connection defendants cite In re Liebster, D.C., 91 F.Supp. 814. But this case involved a disclosure made prior to the Wenchel statement of 1947. Even if the holding of the Liebster case may be deemed sound under the policy as then defined, the later Wenchel statement must be deemed as intended

1. If I might be permitted to step outside my jurisdiction and suggest an official practice calculated to produce with minimum investigatory expense the maximum revenue, I should recommend consideration for a policy and practice whereby the taxpayer should be informed by registered mail of the date when his return is assigned for examination accompanied with notice that no immunity might be expected on account of voluntary disclosures not made within, say, sixty days of the date of the assignment.

to sharpen and narrow the policy as it had theretofore existed.

If, contrary to my holding, it were deemed that the Wenchel statement, which was first published after the routine assignment (but before the disclosure) in this case, were not applicable, the case here would be governed by earlier, and less specific, statements of the policy of providing in substance that the *tempus penitentiae* includes disclosures made "before the Bureau has begun investigating their cases" or before "the intelligence service catches up with him." It may be noted that the defendants' lawyer admitted that in advising his clients to disclose he was familiar with these (superseded, as I think) statements of official policy. But none of the statements ever published, it should be noted, carried a connotation that the *tempus penitentiae* extended until an indictment was found or even until the intelligence service had available all the evidence actually required for an indictment or conviction.

 Under the policy as defined in these statements, I should hold the assignment for investigation to Agent Duffy in May, 1947, of a Form 917 recording as a cash transaction Lichter's purchase of an insurance policy by payment of an $11,000 premium constituted the beginning of an "investigation." It was almost certain that the investigation thus initiated would eventually disclose that the payment had been made by Lichter in currency,—certainly a suspicious circumstance which would lead the agent to inquire of Lichter as to the source of that large amount of cash. And it is reasonable to infer from the absence of evidence to the contrary (the burden of proof for present purposes is of course on the petitioners here) that Lichter could not satisfactorily explain his possession of such a sum without disclosing the Levine transactions in which all the defendants were inextricably implicated. And that the defendants viewed the Duffy inquiry not as one for which an innocent explanation was readily available but rather as one piercing a vulnerable spot in their cloak of fraud, is confirmed by Lichter's frank admission that the inquiry served to accelerate the making of their disclosure.

I conclude, therefore, that whether the Wenchel statement or some earlier statement of policy was applicable, the defendants in making their disclosure were neither misled nor entrapped. No version of the official policy contained a promise, either express or fairly inferable, that a disclosure made as that involved here would be accepted as timely. That being so, it was no more essential for Johnson, the fraud agent, when at the instance of the defendants he received the disclosure from their lawyer on June 9, 1947, to caution them as to their rights than it is for any police or prosecuting officer to caution a suspect against whom it is sought to build a case. Cf. Wilson v. United States, 162 U.S. 613, 16 S.Ct. 895, 40 L.Ed. 1090; Powers v. United States, 223 U.S. 303 at page 313, 32 S.Ct. 281, 56 L.Ed. 448; United States v. Heitner, 2 Cir., 149 F.2d 105; United States v. Block, 2 Cir., 88 F.2d 618; Thompson v. United States, 7 Cir., 10 F.2d 781.

Nor may any promise be found in what the agent Johnson did or said before receiving the disclosure. There is no evidence that Johnson had authority to make a binding ruling on the applicability of the official policy to the disclosure which the defendants contemplated. And there is no evidence that Johnson in words purported to make such a ruling.

Nor will the proved facts support findings either that Johnson had apparent authority to make such a ruling or even that the defendants had a *bona fide* belief that Johnson's conduct in receiving the disclosure was intended, or would operate, to import a binding promise or assurance. It must be remembered that the defendants' lawyer in making the appointment with Johnson had not advised him what taxpayers were involved: even if the defendants did not know that any return had been assigned for examination, their lawyer must have known that Johnson in receiving the disclosure before any opportunity to consult the official files could not possibly know himself whether there had

been such an assignment or whether any investigation of these taxpayers had been initiated. No one in the lawyer's place could sensibly infer that Johnson's silence was intended or effective as a promise or assurance which in no event could be given without critical information which Johnson obviously lacked. When the lawyer without inquiry as to the timeliness of the contemplated disclosure proceeded against such a background, it was plainly at the defendants' risk. If there was any trap, it was one dug by the defendants themselves. At most, the defendants hoped that the disclosure would prove timely. But the government may not be circumscribed in its chosen course by disappointed hopes.

With my holding that the disclosures in question were not timely all other issues raised by the pending petition become moot and the hearing which was continued pending my ruling on the timeliness of the disclosures may now be deemed closed.

It is accordingly hereby ordered that all the petitions be denied and that the cases may be assigned for trial on application.