**LAPIDES v. UNITED STATES.**

**No. 109, Docket 22866.**

United States Court of Appeals Second Circuit.

Argued March 1, 1954.

Decided July 13, 1954.

Frank, Circuit Judge, dissented.

## 254

Bruno Schachner, New York City (Roy M. Zeig, New York City, of counsel), for appellant.

Theodore F. Bowes, U. S. Atty. for Northern District of New York, Syracuse, N. Y., for appellee.

Before CHASE, Chief Judge, and FRANK and HINCKS, Circuit Judges.

HINCKS, Circuit Judge.

The appellant, before any criminal proceedings had been instituted against him, obtained from the court below an order requiring the United States District Attorney to show cause at a session of the court to be held on April 22, 1953, why an order should not be made suppressing evidence claimed to have been illegally obtained by the government, restraining the United States Attorney from submitting such illegally obtained evidence to the Grand Jury, and for other relief. The hearing thereon was held on April 22, 1953, as the show cause order provided. On May 5, 1953, on a written Memorandum Decision, the judge ordered that the appellant's motion, which had initiated the show cause order, be dismissed as having an insufficient basis in law and in fact and as lacking in equity. The dismissal was stated to be "without prejudice." And it is from this order of dismissal that this appeal is taken.

■ Appellant's "motion" was in effect a complaint initiating a civil action seeking suppression of evidence said to have been illegally obtained and to restrain the United States Attorney from presenting such evidence to the grand jury. The suit thus began before any criminal proceedings by the government against appellant had been instituted, and his appeal was therefore not from an interlocutory order entered in the course of a criminal suit. Accordingly, the order denying his motion was a final and appealable order.[1]

■ After entry of this order, and after the appellant had filed his notice of appeal, an indictment against the appellant was filed, as we were told in the arguments on the appeal. The filing of the indictment does not, we think, render the appeal moot. In United States v. Poller, 2 Cir., 43 F.2d 911, at page 912, 74 A.L.R. 1382, after Poller had made a motion to return seized documents, he was indicted; this court held that that fact did not affect the government's appeal from the order, subsequently entered, granting the motion, saying, "Conceivably it might be held that the proceeding became merged in the indictment, but the result would be to make the appealability of the order depend upon the diligence of the prosecution of the proceeding or of the judge in deciding it, either of which is an unsatisfactory test. It seems to us more reasonable to say that it is the time of its initiation which counts * * *. We hold therefore that it is the beginning of the proceeding which determines the appealability of the order, and that, since this was before indictment, we have jurisdiction

1. Perlman v. United States, 247 U.S. 7, 38 S.Ct. 417, 62 L.Ed. 950; Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048; Cogen v. United States, 278 U.S. 221, 225, 49 S.Ct. 118, 73 L.Ed. 275; United States v. Poller, 2 Cir., 43 F.2d 911, 74 A.L.R. 1382; In re Fried, 2 Cir., 161 F.2d 453, 1 A.L.R.2d 996; Centracchio v. Garrity, 1 Cir., 198 F.2d 382; White v. U. S., 5 Cir., 194 F.2d 215, certiorari denied 343 U.S. 930, 72 S.Ct. 760, 96 L.Ed. 1340; cf. U. S. v. Sineiro, 3 Cir., 190 F.2d 397.

of the cause." See also Centracchio v. Garrity, 1 Cir., 198 F.2d 382, 389, an appeal from an order dismissing a motion like that at bar, where the court said: "And though the finding of a true bill by the grand jury defeated one of the objects of petitioner in his motion to suppress, the petition did not thereby become entirely moot, for petitioner still remained interested in the relief sought in so far as it might be directed to the suppression of the evidence at the trial."

We come, therefore, to examine the judge's ruling on the merits. He entered the order to show cause on appellant's motion, in affidavit form, which alleged that, in reliance on a widely publicized policy of the government not to prosecute tax evaders who, prior to the time at which an investigation had been instituted, voluntarily disclosed their delinquency,[2] he had through his attorney made a voluntary disclosure of additional income for the five years 1946 to 1950 by letter dated May 15th; that then and thereafter he "had no knowledge" that any investigation of his income tax liability had been commenced by that time; that he had "no information that any investigation was instituted prior to his voluntary disclosure," and that he was "informed and believed" that his voluntary disclosure made on May 15, 1951 "precipitated the investigation." The motion further alleged on information and belief "that by virtue of clues and leads which were obtained as a result of my confession which was induced by a broken promise of immunity,"[3] the United States Attorney obtained information and records which he proposed, unless restrained, to submit to the grand jury.

In opposition to the appellant's motion, the United States Attorney on April 22, 1953, the day fixed for the hearing set by the show cause order, filed two affidavits, both by Special Agents of the Intelligence Division of the Bureau of Internal Revenue, purporting to be based on actual knowledge. One alleged that, because of newspaper publicity occurring on April 14, 1951 to the effect that the appellant had been arrested on a charge of contriving a lottery and maintaining a place of gambling, on April 16, 1951 the affiant had been assigned to make a preliminary investigation of the appellant's tax returns for the years 1946 through 1950. This affiant further alleged that on April 23, he consulted the Assistant District Attorney in charge of the State case against the appellant, obtaining from him some information about the case; that on April 26, 1951 he requisitioned the appellant's tax returns receiving them from the Collector of Internal Revenue on April 27, 1931; further that he checked records of Dun and Bradstreet relative to the appellant where he received further information; that on May 15, 1951 the investigation was transferred to the other Special Agent whose affidavit alleged that his assignment to

2. That such a policy was in effect in May, 1951, is not disputed. We are told, on argument, that the policy has since been discontinued.

3. The record shows that after May 15, 1951, when the appellant first made his disclosure, the Special Agent in Charge of the Intelligence Unit of the New York office of the Internal Revenue Service by letter dated June 6, 1951 advised the appellant that his disclosure "will be considered voluntary provided there is a full and complete disclosure on the part of the taxpayer and full cooperation." The record further shows that on July 23, 1951 the same Special Agent wrote the appellant "that after further review of the case, I find that your proposal was not timely, and therefore cannot be accepted." It is doubtless to this change of the administrative attitude that the appellant refers when he speaks of a "confession which was induced by a broken promise of immunity." Since the only official promise of immunity was conditional on a disclosure made before the beginning of an investigation, unless it is shown that no investigation began before the disclosure of May 15, 1951, there was no promise at all of immunity. And if no such promise was made, there is no need for us now to rule upon the effect of a hypothetical breach thereof.

investigate began on May 15, 1951 and that the file on the case was physically received by him on the next day.

These affidavits thus posed, as the crucial issue, the timeliness of the disclosure made in appellant's behalf on May 15, 1951, viz.; whether or not the disclosure was made before a departmental investigation had been initiated. And so far as the record shows this issue was submitted for decision solely on the affidavits the contents of which are summarized above. On this submission of the issue we are all agreed that the record did not support an order granting the appellant's motion. For even if it were so that the appellant, when he made his disclosure on May 15, 1951, did not know, notwithstanding the publicity as to his arrest, that a federal tax investigation had already been initiated, and even if in April, 1953, when he brought the motion initiating this proceeding, he thought that his disclosure had precipitated the departmental investigation, it would not follow that his disclosure was timely. Only if, in fact, no investigation had been begun, was his disclosure timely. United States v. Levy, D.C.Conn., 1951, 99 F.Supp. 529. The mere fact that the Department did not inform him and that he did not know that an investigation had been begun was irrelevant. Any holding to the contrary contained in the case of In re Liebster, D.C., E.D.Pa., 1950, 91 F.Supp. 814, we cannot approve. And so we are in complete agreement that if, on the record submitted, the judge below had gone no further than to deny the motion, we should have unanimously affirmed, thus leaving the matter pending in the District Court for such further proceedings as might be had therein.

But was the judge below justified in ordering a final dismissal of the motion even though his order was, as expressly stated, "without prejudice"? (This qualification was obviously made not to indicate a lack of finality in dismissing the pre-indictment motion but rather in recognition of the appellant's right to move *de novo* in any criminal case which might thereafter be instituted to suppress the evidence obtained through his disclosure and to quash the indictment on the ground of the immunity from prosecution claimed to flow from his disclosure.) Or should the judge below have gone no further than to deny the motion leaving it still in court for further hearing on the contested issue as to the timeliness of the disclosure?

As to this, a majority of the court holds that on the record as presented to us there is no showing that the dismissal ordered was erroneous. By the show cause order which issued on his own application the appellant was on notice that his application would be heard on April 22, 1953 and that his proofs in support thereof would then be taken. Nothing in said order suggested that the hearing thus set was to be a preliminary hearing only. It was noted in the caption of the judge's memorandum-decision of May 4, 1953, that the motion was argued on April 22, 1953, the parties then appearing. So far as appears, the parties were then content to make a final submission of the issue as to the timeliness of the disclosure on the affidavits and counteraffidavits. That apparently is just what was done: the record fails to disclose the offer or receipt by either side of any evidence extraneous to the affidavits. We note that the government's affidavits were verified not until April 22; apparently they were filed at the opening of the session or a few hours before. If the appellant was surprised by these affidavits, of course he could have applied for a continuance to give him opportunity to meet their contents either by reply affidavits or by competent evidence. The record fails to show that any such application was made, still less that it was denied.

The majority of the court is therefore unable to see merit in the argument made on appeal, for the first time so far as the record shows, that the court below failed to give the appellant a hearing on the issue of the timeliness of the dis-

closure.[4] As we read the record, the appellant applied for a hearing, was accorded a hearing, and at the hearing, on learning that the government had knowledge of specific facts which if true completely undermined his position, waived the opportunity to offer evidence, and elected to submit the record of fact on the affidavits with argument as to the law. In so doing he led the judge to say in his memorandum: "That a preliminary investigation \* \* \* began on April 16, 1951 \* \* \* is not in dispute." Appellant on brief insists that in this the judge was wrong: that the investigation was in truth disputed. But when the appellant submitted his application, as the record shows, without unequivocal denial, by assertion or proof, of the specific affirmative allegations of the government's affidavits, the judge might properly understand that the government's assertions of the fact and detail of a prior investigation were indeed undisputed. And we think the judge was right in saying that the appellant's assertion of no knowledge of the investigation or of his belief that his own disclosure "precipitated the investigation," created no issues. For the issue as to the timeliness of the disclosure depended, as pointed out above, on the fact of a prior investigation, not on the appellant's absence of knowledge or belief as to that fact. In this sense, as the judge observed in his memorandum, there was indeed no triable issue framed by the affidavits.

The appellant also asserts on brief that "there is an issue of fact whether the alleged preliminary investigation was an investigation within the meaning of the voluntary disclosure policy." But the very statement of this contention shows that it is based upon the investigation alleged in the government's affidavits and posed only a question of law as to the

effect of the facts thus alleged. As indicated above, we think the judge was right in his ruling on this question of law and in holding that the disclosure made not until May was not timely in view of the investigation begun in April.

It is not without significance, we think, that the appellant, who claims to be aggrieved because deprived of opportunity to present evidence, not only failed to offer evidence at the hearing or at an adjournment thereof which he might have obtained, but even now on appeal does not point to any facts helpful to him on the issue of timeliness which he could offer if by reversal of the order he were given another bite at the cherry. However that may be, the majority of the court thinks that in the situation disclosed by the record the judge was right in treating the appellant's case as finally submitted and hence ripe for a final order. And whether or not any issue as to the timeliness of the disclosure was raised by the affidavits, we think the judge was right in ordering a dismissal in reliance on the government's affidavits which had the hallmark of specificity and inherent credibility.

Order affirmed.

FRANK, Circuit Judge (dissenting).

I dissent because I think the trial judge erred in dismissing Lapides' suit, as on a summary judgment, without according Lapides the opportunity to prove his case at a trial on oral evidence, including open-court cross-examination of adverse witnesses.

I say that the judge proceeded as if he were granting a summary judgment, because his opinion specifically states,[1] as the ground of his decision, that Lapides' "allegations raise no triable issue" —the words appropriate in granting summary judgment pursuant to F.R.C.P.

---

4. On brief, the appellant says: "Essentially, this appeal challenges the failure of the court below to grant the appellant a hearing on the issues raised by the pleadings." But nowhere in his brief does the appellant point to anything in the record which shows this failure on the part of the court. We conclude that such baseless assertions are the product either of wishful thinking or of afterthought.

1. The judge's unreported opinion is set forth in Point II of the Appendix to this dissenting opinion.

56(c), 28 U.S.C.A. That statement is crucial. For it shows that—contrary to what my colleagues suggest—the trial judge clearly understood that, if the affidavits disclosed a "triable issue" of fact, Lapides would have been entitled to a trial.

That he called his pleading a "motion" is of no moment. As we said in Hadden v. Rumsey Products, 2 Cir., 196 F.2d 92, 95, "Although Rule 3 states that an action is commenced by filing a complaint it would be quite out of harmony with the spirit of Rule 1 to hold the appellees bound by the labels placed on the papers submitted to the district court." So as my colleagues say, Lapides' so-called "motion" was actually a complaint—consisting in large part of his initial affidavit [2] —which, in a civil suit, sought an injunction to prevent the United States Attorney from obtaining an indictment against him through the presentation to the Grand Jury of certain evidence. My colleagues, in effect, concede that this complaint adequately stated a cause of action. It alleged (inter alia) the following: (1) The government had promised immunity from criminal prosecution to any tax-evader who, before an investigation had been instituted, voluntarily disclosed to the government additional tax liability. (2) Lapides, relying on that promise, made such a disclosure by a letter dated May 15, 1951, to which the appropriate government official replied on June 6 that the disclosure was considered voluntary in accordance with that promise. (3) Lapides is informed and believes that this "voluntary disclosure" of May 15 precipitated the investigation. (4) Through this disclosure, the United States Attorney had procured evidence which he proposed, despite the promise, to submit to the Grand Jury for the purpose of obtaining an indictment against Lapides for criminal tax evasion.

As I understand it, my colleagues agree that, if Lapides could have proved the alleged facts, he would have been entitled to the injunction he sought. For (a) the threat to break such a promise of immunity is a threat of unconstitutional conduct,[3] and (b) an injunction will be granted to prevent a prosecutor from using evidence, in violation of a man's constitutional rights, to obtain that man's indictment.[4] In such an injunction suit, the plaintiff, of course, has the usual right of any plaintiff to a trial on evidence, not on affidavits,[5] unless the record justifies a summary judgment.

But a motion for summary judgment must not be granted on affidavits when it appears, from the opposing affidavits, that there exists a genuine triable issue of fact turning on credibility. Especially is this so when, if such a motion were granted, the opponent of the motion would be deprived of the important rights at a "live" trial (1) to cross-examine adverse witnesses about crucial facts

2. It is set forth in full in Point I of the Appendix to this dissenting opinion. His second affidavit contains nothing of importance.

3. See White v. United States, 5 Cir., 194 F.2d 215, 217; Lisenba v. People of State of California, 314 U.S. 219, 237, 62 S.Ct. 280, 86 L.Ed. 166; Brown v. Allen, 344 U.S. 443, 476, 73 S.Ct. 397, 97 L.Ed. 469.

The trial judge overlooked these cases and held that, taking as true the facts alleged by Lapides, no constitutional question was here involved.

4. See, e. g., Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374; Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed.

1048; Perlman v. United States, 247 U.S. 7, 38 S.Ct. 417, 62 L.Ed. 950; United States v. Poller, 2 Cir., 43 F.2d 911, 913–914, 74 A.L.R. 1382; In re Fried, 2 Cir., 161 F.2d 453, 458, 1 A.L.R.2d 996; White v. United States, 5 Cir., 194 F. 2d 215, 217; cf. Cobbledick v. United States, 309 U.S. 323, 328–329, 60 S.Ct. 540, 84 L.Ed. 783.

Before In re Fried, supra, this doctrine had been often applied to pre-indictment injunctions relative to seized documents or other tangibles. In re Fried extended the doctrine to an unconstitutionally procured confession.

5. See, e. g., Turner v. Camp, 5 Cir., 123 F.2d 840, 842; In re Fried. 2 Cir., 161 F.2d 453, 460.

peculiarly within their knowledge and (2) to have the trial court observe their demeanor while testifying.

See 6 Moore, Federal Practice (2d ed. 1953) pp. 2059, 2067, 2070, 2110, 2121, 2133–2135, 2219, and cases there cited, including the following: Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967; Elgin, J. & E. R. Co. v. Burley, 325 U.S. 711, 719, 65 S.Ct. 1282, 89 L.Ed. 1886; Colby v. Klune, 2 Cir., 178 F.2d 872; Fogelson v. American Woolen Co., 2 Cir., 170 F.2d 660; Toebelman v. Missouri-Kansas Pipe Line Co., 3 Cir., 130 F.2d 1016, 1018; Sarnoff v. Ciaglia, 3 Cir., 165 F.2d 167; Whitaker v. Coleman, 5 Cir., 115 F.2d 305, 306; Gray Tool Co. v. Humble Oil & Refining Co., 5 Cir., 186 F.2d 365, 367; Campana Corp. v. Harrison, 7 Cir., 135 F.2d 334, 336; Walling v. Fairmont Creamery Co., 8 Cir., 139 F.2d 318; Dulansky v. Iowa-Illinois Gas & Electric Co., 8 Cir., 191 F.2d 881; Lane Bryant v. Maternity Lane, Ltd., 9 Cir., 173 F.2d 559, 565; Avrick v. Rockmount Envelope Co., 10 Cir., 155 F.2d 568, 571, 573.

The government filed affidavits of two government agents. Lapides contends on this appeal that these affidavits do not squarely clash with his affidavit. I shall assume, however, *arguendo,* that the trial judge would have been obliged to dismiss this suit on the merits if the statements contained in the affidavits of the government agents had been embodied in oral evidence at a trial and if the trial judge had then believed their testimony to be true. But the outstanding fact is that no such trial was held. Instead, the judge dismissed the complaint on the basis of the affidavits only. In his opinion explaining that dismissal, the

judge said: "That a preliminary investigation of [Lapides'] tax return began on April 15, a month before the writing of the letter which it is alleged constituted a disclosure, is not in dispute. It is only asserted that [Lapides] had no information relative thereto. Such allegations raise no triable issue at this stage of the proceeding." If the judge's description of Lapides' allegations were correct, I would agree that a summary judgment would have been proper. For Lapides would not be entitled to immunity merely because, when he made the disclosure, he did not know that an investigation had been begun.[6]

But the judge entirely overlooked Lapides' additional sworn statement: "I am informed and believe that my voluntary disclosure precipitated the investigation." If, at a trial, Lapides proved that his disclosure had "precipitated the investigation," then, of course, he would prove that his disclosure in fact antedated the investigation—and he would therefore be entitled to a decision that the government was bound by the promise of immunity. Only, then, because the judge ignored that allegation could he conclude that there was "no triable issue."[7]

There is an all-important difference between (1) Lapides' sworn allegation of lack of knowledge that any investigation was under way when he made his disclosure and (2) his sworn allegation that in fact it was not then under way and was thereby induced. For allegation (1) does not assert any compliance by Lapides with the offer of immunity. United States v. Levy, D.C., 99 F.Supp. 529. Allegation (2), however, does specifically assert such compliance. In suggesting

6. United States v. Levy, D.C., 99 F.Supp. 529.

7. I think that perhaps I understand how the judge came to make this mistake about Lapides' allegation: Lapides' affidavit contained this statement, in a paragraph numbered 5: "I had no knowledge (and I have none now) that any investigation of my income tax liability had been commenced by that time [May 15, 1951]

or for some time thereafter." Obviously, it was that allegation to which the judge referred in reaching his conclusion. But fourteen paragraphs later—in a paragraph numbered 19—came Lapides' allegation that his "voluntary disclosure precipitated the investigation." My colleagues say (in effect) that the judge referred to the contents of paragraph 19. I think it clear that he neglected it.

that (1) and (2) have the same legal effect, my colleagues are wrong, I think.

Lapides' sworn allegation (in paragraph 19) that his disclosure antedated and precipitated the investigation was on information and belief. But that sufficed. For patently, Lapides could not know of his own knowledge that the investigation began after his disclosure. In United States ex rel. Accardi v. Shaughnessy, 2 Cir., 206 F.2d 897, 900, a sworn habeas corpus petition stated, on "information and belief," facts as to conduct of the Attorney General. This statement was categorically denied in opposing affidavits filed by the government. A majority of this court, in affirming an order denying the habeas corpus petition, said that "the assertion of a mere suspicion or 'belief' " was insufficient. The dissenting opinion disagreed with that ruling, saying: "In a variety of circumstances, it has been held that such an allegation suffices where, as here, the asserted facts are thus not within affiant's personal knowledge" —citing, as illustrative, Berger v. United States, 255 U.S. 22, 34–35, 41 S.Ct. 230, 65 L.Ed. 481; Kelly v. United States, 9 Cir., 250 F. 947, 948–949; Creekmore v. United States, 8 Cir., 237 F. 743—and continued: "I think the district court should be directed to afford relator an opportunity to prove those facts, just as in the Root Refining case [8] the Supreme Court ordered a trial of the movant's charge of bribery." The Supreme Court, having granted certiorari, 347 U.S. 260, 74 S.Ct. 499, 502 after referring to the ruling (by this court's majority) that "the assertion of mere 'suspicion and belief' * * * does not require a hearing", reversed with directions to the district court to hold a hearing on oral testimony at which petitioner would have the chance to prove the alleged fact. See also Carroll v. Morrison Hotel Corp., 7 Cir., 149 F.2d 404, 406; 2 Moore, Federal Practice (2d ed.) § 8.13 (p. 1654 note 22) and § 12.08.

Lapides' affidavit disclosed the basis of his "information and belief": Attached as an exhibit to his affidavit is a letter of June 6, 1951 to Lapides' lawyer from Bardel, the "Special Agent in Charge," which says: "This is to advise you that after a review of the facts in the case, this disclosure will be considered voluntary provided there is a full and complete disclosure on the part of this taxpayer and full cooperation as indicated in your letter" (i. e., the letter of Lapides' lawyer of May 15, 1951).[9] Accordingly, there was an ample and reasonable basis for his "information and belief."

It follows that Lapides' sworn allegation that his disclosure precipitated the investigation must be read without any diminution of its effect because of the phrase "on information and belief." If, without filing any affidavits, the government had moved to dismiss the complaint, it would have been necessary to take Lapides' allegation as true,[9a] and consequently to deny the motion.

Assuming, arguendo, that the affidavits of the government agents flatly contradicted Lapides' affidavit, was it necessary for Lapides, after the filing of the agents' affidavit, in order to preclude a summary judgment adverse to him, to file a further affidavit denying what the agents said? Surely not. He could do no more than to repeat what he had already sworn to, i. e., that he was informed of, and believed, facts contradictory to what the agents said; and for Lapides to repeat that statement in a reply affidavit could have served no purpose.

Assuming that the agents' affidavits flatly clashed with Lapides' affidavit as to the date when the investigation commenced and how it was initiated, he had the right (as I have said) to a trial at

8. Universal Oil Co. v. Root Refining Co., 328 U.S. 575, 580, 66 S.Ct. 1176, 90 L. Ed. 1447.

9. For the correspondence, see the Appendix to this opinion.

9a. 2 Moore, Federal Practice (2d ed.) p. 2269; Virgin Islands Corp. v. W. A. Taylor & Co., 2 Cir., 202 F.2d 61.

For a recent decision to that effect, see Mitchell v. Pilgrim Holiness Church. Corp., 7 Cir., 210 F.2d 879, 881.

which he could, in open court, cross-examine the government agents on the issue, and at which the trial judge would observe their demeanor while testifying, so as to be able to determine their credibility.

By way of answer, my colleagues argue that Lapides, by not explicitly demanding such an open-court trial, "waived" it. This is a curious argument. Up to now, no court has ever held that, in order to have a trial, a plaintiff must expressly ask for it. Nor has any court held that, if a defendant moves for summary judgment and it appears that there is a genuine issue of triable fact, nevertheless the judge can properly enter judgment for the defendant unless the plaintiff then declares he wants to go to trial.

To round out the discussion, this should be added: "The moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts. * * * The courts hold the movant to a strict standard. * * * Since it is not the function of the trial court to adjudicate genuine factual issues at a hearing on the motion for summary judgment, in ruling on the motion all inferences of fact from the proofs offered at the hearing must be drawn against the movant and in favor of the party opposing the motion. And the papers supporting movant's position are closely scrutinized, while the opposing papers are indulgently treated, in determining whether the movant has satisfied his burden." See 6 Moore, Federal Practice (2d ed. 1953) pp. 2123–2125 and the numerous cases there cited.

The trial judge made two other mistakes in addition to the mistake which I have already described. In his opinion he said that determination of the issue tendered by Lapides "would require an examination into the mental operations of the investigating agents." The judge added, "No precedent is cited which would justify such a course in the proceeding here." That position is untenable. Courts frequently have to examine the "mental operations" of witnesses in many kinds of situations, including those like that here. I concur in the remark in Lapides' brief that "if judicial inquiry as to the circumstances under which the evidence [as to Lapides' tax evasion] was acquired in this case could be cut off [without a trial], it would afford the opportunity for shocking administrative conduct." It would negate many of the decisions holding that a court will grant a pre-indictment injunction to suppress unconstitutionally-procured evidence.[10]

This mistake of the judge ties into another: He speaks of his inability to give the requested relief "at this stage of the proceeding." This shows, I think, that he dealt with this suit in the belief that it was but a "stage" in a criminal proceeding. That such was his belief is further indicated by the fact that, although he held the suit "insufficient in law" and "lacking in equity," his dismissal was "without prejudice." This belief was in error: The cases hold that an action like Lapides' is an independent suit, not a part of a criminal proceeding which may later be instituted.[11]

It may be suggested that perhaps the hearing on affidavits which the judge held

10. If, at a trial of his injunction suit, Lapides proved that the government got disclosures from him through an immunity-promise, he would establish a *prima facie* case, i. e., the burden would be on the government to prove that none of the evidence it proposed to use in seeking appellant's indictment had stemmed from this tainted source. See, e. g., United States v. Nardone, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307; United States v. Goldstein, 2 Cir., 120 F.2d 485, 488; United States v. Coplon, 2 Cir., 185 F.2d 629, 636, 28 A.L.R.2d 1041.

If the government then attempted to carry this burden, there would result the very kind of inquiry which the district judge rejected on the ground that it "would require an examination into the mental operations of the investigation agents." It is precisely because their "mental operations" are, by their very nature, unknown to Lapides, that the government would have the burden of proof in that respect, with opportunity to Lapides to cross-examine the agents.

11. See cases cited in footnote 4.

should be regarded as a hearing of a motion for a preliminary injunction. If so, the judge had discretion to deny that preliminary relief. But, unless, on considering such a motion, a judge holds that the complaint itself, in the light of plaintiff's admissions, reveals no merits, he may not dismiss the complaint. The judge did so hold; but in doing so, I think that, for reasons canvassed above, he erred.

My colleagues hold, and I entirely agree, that the appeal did not become moot when, pending appeal, the government indicted Lapides. In United States v. Poller, 2 Cir., 43 F.2d 911, 912, 74 A.L.R. 1382, this court said (per L. Hand, J.): "If this proceeding had been concluded before indictment found, the order would certainly have been appealable. Perlman v. United States, 247 U.S. 7, 38 S.Ct. 417, 62 L.Ed. 950; Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 475, 65 L.Ed. 1048, 13 A.L.R. 1159. The point here taken is that Poller was indicted before final submission of the proceeding; that immediately upon indictment found, it became a part of the prosecution. * * Conceivably it might be held that the proceeding became merged in the indictment, but the result would be to make the appealability of the order depend upon the diligence of the prosecution of the proceeding or of the judge in deciding it, either of which is an unsatisfactory test. It seems to us more reasonable to say that it is the time of its initiation which counts, and for this we have the language of the opinion in Cogen v. United States, 278 U.S. 221, 225, 49 S.Ct. 118, 73 L.Ed. 275. * * * We hold therefore that it is the beginning of the proceeding which determines the appealability of the order, and that, since this was before indictment, we have jurisdiction of the cause."

In this connection, the following should be noted: If a trial judge dismisses an injunction suit and, pending appeal (without a supersedeas) the defendant takes the very action which the plaintiff sought to enjoin, then, if the upper court reverses, the trial court, on plaintiff's request, will require restitution of the *status quo ante*.[12] So here, if (as I think we should) we now reversed and remanded for a trial, and if, after such a trial the district court should hold that, on the facts, an injunction should have issued before indictment, it would order the prosecutor to quash the indictment.[13]

### Appendix

### I

#### Affidavit of Max Lapides

"State of New York,
"County of New York, ss.:

"Max Lapides, being duly sworn deposes and says:

"(1) This affidavit is made by me in support of an application to suppress certain evidence which I believe to have been illegally obtained; to require the return of certain books, papers, documents, and records; to restrain the United States Attorney from bringing before the Grand Jury such illegally obtained evidence; and for such further and different relief as this Court may deem just and proper.

"(2) Hon. Edmond Port, United States Attorney for the Northern District of New York, has stated that he intends to submit evidence to the Grand Jury in and for the Northern District of New York, at its current term, for the purpose of obtaining against me an indictment charging me with income tax evasion in violation of § 145(b) of Title 26, U.S.C.

"(3) I am informed and I believe that some or all of the evidence which it is intended to present to the Grand Jury was obtained as a result of a confession

12. See, e. g., Welton v. 40 East Oak St. Bldg. Corp., 7 Cir., 70 F.2d 377; Restatement of Restitution, § 74(b); cf. Golde Clothes Shop v. Loew's Buffalo Theatres, 236 N.Y. 465, 141 N.E. 917, 30 A.L.R. 931.

13. For, if the injunction had been granted before the indictment, the finding of facts necessary to support the injunction order would have been *res judicata* at any trial based on a subsequent indictment.

which I made and clues and leads which I furnished under a promise of immunity by the Government of the United States, which the Government now refuses to honor. The circumstances under which I was induced to confess, the confession itself, and subsequent events so far as they are now known to me are set forth below.

"(4) At all times material to these proceedings it was the policy of the Government of the United States not to prosecute alleged tax evaders who, prior to the time at which an investigation had been instituted, voluntarily disclosed additional tax liability. This policy has been uniformly followed in all cases of alleged tax evasion. This so-called voluntary disclosure policy was widely advertised and it was intended that persons who might be guilty of tax evasion should take advantage of the immunity which they could obtain by disclosing additional tax liability, thereby saving the Government the expense and hazards of an investigation.

"(5) This policy was known to me prior to May 15, 1951. I had no knowledge (and I have none now) that any investigation of my income tax liability had been commenced by that time or for some time thereafter. In fact, as more fully set forth below, I had been informed in an official communication of the Bureau of Internal Revenue that a voluntary disclosure on my part would be accepted.

"(6) With the sole intent and purpose of making a voluntary disclosure I retained one Edward Riederman, an attorney who is experienced in tax matters, to advise me in connection with the disclosure and to communicate with the Bureau of Internal Revenue on my behalf.

"(7) Edward Riederman informed me that prior or about May 15, 1951, he had spoken to Walter P. Murphy, Assistant Special Agent in Charge of Intelligence. He told Mr. Murphy that he wanted to make a voluntary disclosure on my behalf. He was informed to address a letter to this effect to the Bureau of Internal Revenue.

"(8) Thereafter, on May 15, 1951, Mr. Riederman wrote a letter a copy of which is attached hereto and marked Exhibit 'A.'

"(9) Exhibit 'A,' as is evident from the stamp appearing on it, was received by the Bureau of Internal Revenue at 4:35 P.M. on May 15, 1951.

"(10) The receipt of Exhibit 'A' was acknowledged further in a letter dated May 16, 1951, a copy of which is attached hereto and marked Exhibit 'B.'

"(11) I am informed by Mr. Riederman and I believe that thereafter and prior to June 6, 1951, Mr. Riederman received a telephone call from the office of Assistant Special Agent in Charge, Murphy, asking him to supply the serial and block numbers appearing on the back of the cancelled checks with which I had paid my taxes. He was told that these numbers were wanted so as to enable the Bureau of Internal Revenue readily to locate the Collectors' Offices at which my tax returns had been filed and the returns themselves at those offices.

"(12) Thereafter, Mr. Riederman spoke to Mr. Francis Kennedy, Acting Assistant Special Agent in Charge, and supplied the numbers wanted, and the districts at which I had filed my tax returns.

"(13) I had supplied the checks, as well as all other information, to Mr. Riederman, my counsel, solely for the purpose of making a voluntary disclosure.

"(14) Thereafter, Mr. Riederman received a letter dated June 6, 1951, from the Bureau of Internal Revenue a copy of which is attached hereto and marked Exhibit 'C.'

"(15) Before and after the receipt of Exhibit 'C' I had imparted information and records pertaining to my tax liability and to my assets, to Mr. Riederman, my counsel, and to one Sam Stern, an accountant whom I had retained solely in connection with this voluntary disclosure.

"(16) Prior to or on July 17, 1951, the computation of the figures showing the details of my voluntary disclosure was

completed, and on that day Mr. Riederman sent on my behalf to the Bureau of Internal Revenue a letter, a copy of which is annexed hereto and marked Exhibit 'D.'

"(17) In reliance on the fact that the Bureau of Internal Revenue would accept a voluntary disclosure of my tax liability, on July 18, 1951, Mr. Riederman on my behalf furnished details of my tax liability and books and records pertaining to it to the authorities of the State of New York which have the same policy as the Federal Government. My disclosure was duly accepted as voluntary by the State of New York.

"(18) Thereafter Mr. Riederman received a letter from the Bureau of Internal Revenue which is dated July 23, 1951, a copy of which is attached and marked Exhibit 'E.'

"(19) I have no information that any investigation was instituted prior to my voluntary disclosure, on the contrary, I am informed and I believe that my voluntary disclosure precipitated the investigation.

"(20) I am informed and I believe that Mr. Riederman, my counsel, and Sam Stern, the accountant, both of whom I had retained for the purpose of making a voluntary disclosure and entrusted with records and information were questioned by agents of the Bureau of Internal Revenue subsequent to July 23, 1951, concerning my income tax liability and that clues and leads were obtained from them.

"(21) I am further informed and I believe that other persons, including the authorities of the State of New York, to all of whom I entrusted information in reliance on the voluntary disclosure policy were questioned by, and gave information concerning my income tax liability to, agents of the Bureau of Internal Revenue.

"(22) I am informed and I believe that by virtue of clues and leads which were obtained as a result of my confession which was induced by a broken promise of immunity, the Bureau of Internal Revenue was enabled to obtain information about records, and to obtain records of diverse corporations.

"(23) I am informed and I believe that evidence illegally obtained in the manner described above will be presented to the Grand Jury at its current term unless this Court were to restrain the presentation.

"(24) Irreparable injury and hardship would be caused to me if the Grand Jury were to indict me.

"(25) For all the reasons above set forth, I respectfully request that this Court make an order as follows:

"(a) Suppressing all evidence obtained by or as a result of the use of illegal means and ordering the return of all physical records and objects to myself or such other persons as may be lawfully entitled thereto;

"(b) Restraining the United States Attorney from submitting any illegally obtained evidence to the Grand Jury;

"(c) Containing such other provisions as may be just.

"Max Lapides.

"Sworn to April 7, 1953."

*Exhibit A, Annexed to Affidavit of Max Lapides*

"Received 1951 May 15 PM 4 35 Special Agent in Charge

"New York Division

"Intelligence Unit

"May 15, 1951

"Special Agent in Charge,

"Intelligence Unit—Treasury Department

"253 Broadway,

"New York, N. Y.

"Dear Sir:

"I am desirous of disclosing additional income for Max Lapides of 150 West 179th Street, Bronx, New York, for the years 1946, 1947, 1948, 1949 and 1950.

"The figures are now being worked up and as soon as they are finished, I will communicate with your office.

"Very truly yours,

"Edward Riederman."

"ER:jd

*Exhibit B, Annexed to Affidavit
of Max Lapides*

"U. S. TREASURY DEPARTMENT INTERNAL REVENUE SERVICE

"Intelligence Unit New York (Name of Division) (WPM): ADB

"253 Broadway, Tenth Floor
"New York 7, New York.
"May 16, 1951

"Edward Riederman, Esq.
"400 Madison Ave.,
"New York 17, New York

In re: Max Lapidus
150 West 179th Street
Bronx, New York

"Dear Mr. Riederman:

"Receipt is acknowledged of your letter of May 15, 1951, advising that you desire to make a disclosure of income not reported by the above-named individual for the years 1946 to 1950, inclusive, and enclosing Power of Attorney filed in his behalf together with fee statement executed by you.

"A preliminary investigation will be made and you will be duly advised whether or not your proposed disclosure can be considered voluntary.

"Very truly yours,
"J. R. Baradel
"Special Agent in Charge"

*Exhibit C, Annexed to Affidavit
of Max Lapides*

"U. S. TREASURY DEPARTMENT
"Internal Revenue Service

"Intelligence Unit New York
"Name of Division (WPM): ADB

"253 Broadway, Tenth Floor
"New York 7 New York
"June 6, 1951

"Edward Riederman, Esq.
"400 Madison Ave.
"New York 17, New York

In re: Max Lapides
120 West 179th Street
New York, New York

"Dear Mr. Riederman:

"Reference is made to your letter of May 15, 1951, and to our reply relative to a proposed voluntary disclosure of income not reported by the above-named individual on income tax returns filed by him for the years 1946 to 1950 inclusive.

"This is to advise that after a review of the facts in the case, this disclosure will be considered voluntary provided there is a full and complete disclosure on the part of this taxpayer and full cooperation as indicated in your letter.

"Very truly yours,
"J. R. Baradel
"Special Agent in Charge"

*Exhibit D, Annexed to Affidavit
of Max Lapides*

"July 17, 1951

"Intelligence Unit—Treasury Department

"253 Broadway,
"New York, New York

"Re: Max Lapides
Harry Bell

"Gentlemen:

"Recently a disclosure was made to your office in connection with the above entitled matters. The details of said disclosure were not made at that time in view of the fact that the accountants were preparing the figures. Such figures are now available, and I am ready to submit same to the special agent designated to handle these matters.

"Very truly yours,"

*Exhibit E, Annexed to Affidavit of
Max Lapides*

"U. S. TREASURY DEPARTMENT
"Internal Revenue Service
"New York 7, New York,
July 23, 1951

"Intelligence Unit
"New York
"(Name of Division)
WPM:DRO'D

"Edward Riederman, Esq.
"400 Madison Avenue
"New York 17, New York

In re: Max Lapides
"Harry Belitsky a/k/a
"Harry Bell (1950)
"150 West 171st Street
"formerly
"2454 Webb Avenue
"Bronx, New York

"Dear Sir:

"Reference is made to previous correspondence relative to your proposal to

voluntarily disclose income not reported by the above-named individuals for the years 1946 through 1950, and particularly to letters from this office dated June 16, 1951, advising that after review of the facts in the case your disclosure would be considered voluntary under certain conditions.

"I now have to advise that after further review of the case, I find that your proposal was not timely, and therefore cannot be accepted.

"Very truly yours,

"J. R. Baradel

"Special Agent in Charge"

## II

### Opinion of the Trial Judge

"This proceeding raises questions concerning the power of the Court to restrict the use of evidence by the United States Attorney and the Grand Jury in a criminal proceeding, and the legal propriety of the exercise of such power at the preindictment stage.

"The problem reaches the Court through the medium of an order to show cause which seeks: (a), the suppression of all evidence obtained by or as the result of the use of illegal means by the United States government, and providing for the return of all physical records and objects; (b), the restraining of the United States Attorney from submitting any illegally obtained evidence to the Grand Jury; (c), the suppression of all evidence obtained in violation of the privileged character of communications between attorney and client. The order is based upon the affidavits of Max Lapides, verified the 7th and 8th days of April, 1953, and is supplemented by five exhibits consisting of letters passed between United States Treasury agents and counsel for Mr. Lapides. The United States Attorney has filed the affidavits of Thomas J. Victory and Richard W. Saunders, agents of the Treasury Department, in opposition to the requested relief. A brief statement of the facts disclosed in the affidavits is necessary to a determination of the nature and measure of relief which may be afforded.

"The moving affidavits disclosed that the United States Attorney has indicated that he intends to submit evidence to the Grand Jury now in session, to the end that the Grand Jury may determine whether or not an indictment should be returned against the affiant by reason of a violation of the Internal Revenue Law. The affiant alleges upon information and belief that some or all of such evidence '—was obtained as a result of a confession which I made and clues and leads which I furnished under a promise of immunity by the Government of the United States, which the Government now refuses to honor.' Then follows a statement to the effect that at all the times material in this proceeding it was the policy of the United States not to prosecute alleged tax evaders who, prior to the time at which an investigation had been instituted, voluntarily disclosed additional tax liability. The policy was known to the affiant and for the purpose of making a voluntary disclosure he retained an attorney to act for him in that connection. The attorney advised the affiant that prior to or about May, 1951, he had spoken to a special agent of the Bureau, advising that he wanted to make a voluntary disclosure on behalf of the affiant, and was advised to address a letter to that effect to the Bureau of Internal Revenue. On May 15, 1951, such a letter was written and received at a New York office of the Treasury Department. The body of the letter is quoted below:

" 'I am desirous of disclosing additional income for Max Lapides of 150 West 179th Street, Bronx, New York, for the years 1946, 1947, 1948, 1949 and 1950.'

" 'The figures are now being worked up and as soon as they are finished, I will communicate with your office.'

"Under date of May 16, 1951, receipt of the letter was acknowledged, advising that a preliminary investigation would be made and that counsel would be advised as to whether or not the proposed disclosure can be considered voluntary. Sometime prior to June 6, 1951, affiant's

attorney supplied to a special agent of the Treasury Department at his request, the serial and block numbers appearing on the back of the cancelled checks with which the affiant had paid income taxes. This information was requested and given in order to enable the Bureau of Internal Revenue to locate more readily the tax returns. Under date of June 6, 1951, the special agent in charge of the New York Intelligence Unit of the Treasury Department wrote affiant's counsel, the material part of which is quoted below:

" 'This is to advise that after a review of the facts in the case, this disclosure will be considered voluntary provided there is a full and complete disclosure on the part of this taxpayer and full cooperation as indicated in your letter.'

"On July 17, 1951, counsel wrote a letter to the same New York office, advising in effect that the figures relative to the additional income of Mr. Lapides referred to in the letter of May 15, 1951, had been completed, were available and ready for submission to the special agent designated. The letter was acknowledged under date of July 23rd, and counsel was advised that after a further review of the case the proposed disclosure was not timely and, therefore, could not be accepted.

"The affiant further alleges upon information and belief that his counsel and an accountant, both of whom had been retained for the purpose of making the disclosure referred to above, had been questioned by revenue agents subsequent to July 23, 1951, concerning his income tax liability, and that clues and leads were obtained from them. A similar allegation is made as to the questioning of other unnamed persons, including the authorities of the State of New York. The affidavit alleges that the affiant has no information that any investigation as to his income tax liability had been instituted prior to the alleged voluntary disclosure, and he believes that such disclosure precipitated the investigation.

"It is averred upon information and belief that 'clues' and 'leads' which were obtained as a result of the affiant's 'confession' enabled the agents of the Bureau of Internal Revenue to obtain additional information and records, and that evidence illegally obtained will be presented to the Grand Jury at its current session which would result in irreparable injury and hardship should an indictment follow.

"The affidavit of Mr. Lapides, verified April 8, 1953, alleges upon information and belief that two of his attorneys have been subpoenaed to testify before the Grand Jury relative to his business affairs. He further asserts 'I believe that these attorneys furnished the information and records in violation of the privileged character of communications had between attorney and client.'

"The answering affidavits are made by a Mr. Victory and a Mr. Saunders, agents of the Bureau of Internal Revenue. Mr. Victory avers in substance that on April 16, 1951, the matter of the tax returns of Mr. Lapides for the years 1946 to 1950 were assigned to him for preliminary investigation. He states unequivocally that the investigation arose by reason of the arrest of Mr. Lapides in connection with a raid on certain premises in New York City, and that on the 14th day of April, 1951, an article appeared in a New York City newspaper referring to a charge placed against Mr. Lapides relating to gambling activities; that on April 23, 1951, the agent interviewed an Assistant District Attorney of Bronx County, New York, who was in charge of the State proceeding against Lapides at that time; that he received certain information from him, and that the state official requested that the examination of his files be deferred until the State had completed its pending case. The agent further states that on April 26, 1951, he requisitioned the tax returns of Lapides from the Bureau. A photostatic copy of such requisition is attached to the affidavit. The agent on the 7th and 9th of May, 1951, investigated and checked the Dun and Bradstreet records relative to Mr. Lapides, and on the 15th day of May, 1951, the case was transferred to Special

Agent Saunders, then a member of the so-called 'racket squad,' who thereupon assumed control of such investigation. Agent Victory further states that at no time did he talk with Mr. Lapides, his accountant, or his attorney, or any of his relatives; neither did he receive information from the New York State Department of Taxation and Finance relative to the investigation.

"Agent Saunders corroborates the statement of Agent Victory as to the transfer of the investigation and the file. He further alleges that he requested certain records in a phone conversation with the wife of Mr. Lapides, who declined to produce same; that he had a telephone conversation with the accountant referred to in Lapides' affidavit, and was informed that records would have to be procured through a Mr. Zeig, an attorney; that some records of certain corporations were turned over to him at the attorney's office. He also interviewed Mr. Lapides and obtained historical background but no information, facts or figures relating to his activities from 1946 to 1950. He states that he received no information from the New York State Department of Taxation and Finance, and received no factual information whatsoever by virtue of any so-called 'voluntary disclosure.' With the above background of facts in mind, it would seem logical to consider the nature of the present proceeding and the factual requirements which would warrant court action therein.

"The proceeding, although taking the form of a motion to suppress evidence under the provisions of Rule 41(e), Federal Rules of Criminal Procedure [18 U. S.C.A.], is in effect an application in which the Court is requested to determine the admissibility of evidence which affiant believes is about to be submitted to a Grand Jury. The moving party relies upon the case of In re Fried, 2 Cir., 161 F.2d 453, 1 A.L.R.2d 996, but that case principally involved the suppression of a confession alleged to have been obtained in violation of constitutional rights. Here there is no unlawful sei-

zure; neither is there a claim of violation of constitutional rights. No statutory provision has been violated, and the proceeding appears to be one based on equitable considerations to the effect that the United States should not be permitted to use evidence obtained through overreaching, misleading or entrapping a defendant. Even a slight consideration of our system of administering criminal law would require the conclusion that the proceeding is one which will be entertained only where it is clearly shown that fundamental rights are threatened. It would appear that similar proceedings were entertained in White v. United States, 5 Cir., 194 F.2d 215, and Centracchio v. Garrity, 1 Cir., 198 F.2d 382, and the following quotation taken from the latter case at page 387, would seem to be appropriate.

"'Judicial interference of this sort with the action of a United States Attorney in the administration of criminal law, at a pre-indictment stage, must, we think, be regarded as the exception rather than the rule.'

"Any further proceeding herein by this Court would be an extension of the rule contained in any precedent with which it is familiar. The opinion of Judge L. Hand in In re Fried, supra, shows that the decision there as to the confession is confined strictly to the suppression of evidence obtained in violation of a constitutional right. The same conclusion is arrived at in White v. United States, supra. Centracchio v. Garrity, supra, holds that evidence secured from the taxpayer pursuant to the Bureau's policy was not in violation of constitutional rights; neither did it involve a contractual breach, an illegal seizure, or a violation of statute law. The case seems to limit a proceeding such as we have here to equitable consideration by the Court rather than to confine same within the procedural requirements of Rule 41(e), F.R.C.P.

"It may be sufficient for the purpose of this decision to dispense with a hearing and deny the application upon the author-

ities of the precedents cited above. However, United States v. Frankfeld, D.C., 100 F.Supp. 934, and United States v. Flynn, D.C., 103 F.Supp. 925, may be considered as somewhat analogous to the problem here. These cases arose by reason of a dispute as to information obtained by alleged illegal wiretapping. The problem involved the violation of a statute, but no hearing was held and relief was denied because of the indefiniteness of the allegations in the moving papers. That taint attaches to evidence in the possession of the government must be shown with solidity. (Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307.)

"If it is considered that the motion is addressed to the Court upon the bases of the equities shown, it is apparent that there is no controversy as to the existence of the 'policy' of the Bureau of Internal Revenue as to the consideration to be given taxpayers who disclose additional income for prior years. That a preliminary investigation of the moving party's tax return began on April 16, 1951, a month before the writing of the letter which it is alleged constituted a disclosure, is not in dispute. It is only asserted that the moving party had no information relative thereto. Such allegations raise no triable issue at this stage of the proceeding. There is no definite showing that any evidence was given to the agents of the Bureau prior to the letter of July 23rd. It is correct that certain numbers or symbols were furnished to the Bureau to enable it to locate more readily the tax returns of the moving party. No disclosure was made by this act. The returns were already in the possession of the Bureau. In any event, the Court does not understand that the contention is made that the returns are thereby rendered inadmissible. The allegation in the moving papers as to 'clues' and 'leads,' based upon the disclosure of July 15th is vague and indefinite. To determine the existence of same would require an examination into the mental operations of the investigating agents. No precedent is cited which would justify such a course in the proceeding here.

"There remains only the matter of the alleged confidential communication between attorney and client. This Court will not assume that the United States Attorney will offer evidence which is prohibited or inadmissible. (Section 353, New York Civil Practice Act). Neither will the Court assume that attorneys will disclose communications foreclosed under the provisions of the same section.

"The Court recognizes the danger of piecemeal determinations of questions of law or of fact concerning alleged crimes, indictments for which have not yet been found. Such danger especially exists where the trial may be held before a different judge or in a different court. It would seem that a clear case of threatened injury and peculiar urgency must be shown before such procedure may be invoked. No such showing is made here. The moving papers are indefinite, lack certainty of allegations of fact, and fail to warrant interference by this Court at this time in the orderly process of the administration of our criminal law.

"The motion is dismissed as having an insufficient basis in law and in fact, and is lacking in equity. The dismissal is without prejudice.

"It is ORDERED accordingly.
                    STEPHEN W. BRENNAN
                              U.S.D.J."