Tony LEGATOS (True Name Antonio Legatos) and John Glynn, Appellants,

v.

UNITED STATES of America, Appellee.

No. 14094.

United States Court of Appeals Ninth Circuit.

May 12, 1955.

Rehearing Denied June 30, 1955.

| Name | No. of shares |
| --- | --- |
| W. H. Frantz | 850 |
| L. B. Frantz (wife of W. H. Frantz) | 850 |
| H. P. Frantz | 300 |
| Harry Norman Ball | 1 |

| Name | Per cent |
| --- | --- |
| W. H. Frantz | 45.14 |
| L. B. Frantz (wife of W. H. Frantz) | 45.14 |
| H. P. Frantz | 9.72 |

| Name | Per cent |
| --- | --- |
| W. H. Frantz | 60 |
| H. P. Frantz | 30 |
| James J. McDevitt | 10" |

See 21 T.C. at page 117.

Harold C. Faulkner, Allan L. Fink, Melvin, Faulkner, Sheehan & Wiseman, San Francisco, Cal., Grant G. Calhoun, Carlson, Collins, Gordon & Bold, F. Walter French, Richmond, Cal., for appellants.

Lloyd H. Burke, U. S. Atty., Robert H. Schnacke, Asst. U. S. Atty., San Francisco, Cal., Macklin Fleming, Sp. Asst. to Atty. Gen., for appellee.

Before DENMAN, Chief Judge, ORR, Circuit Judge, and DRIVER, District Judge.

DRIVER, District Judge.

Tony Legatos and John Glynn were indicted April 4, 1951. The first count of the indictment charged that defendants attempted to defeat and evade a large part of Legatos' income tax for the year 1944 by understating the partnership and business receipts of Legatos and, in the case of Legatos, by filing a false and fraudulent income tax return in which the amount of his net income was substantially understated, all in violation of Title 26, U.S.C. § 145(b). The second and third counts were similiar to the first count in all respects except that, they charged attempted evasion of Legatos' income taxes for the years 1945 and 1946, respectively.

The trial began May 18, 1953, and was concluded June 27, of the same year.[1] At the close of the Government's case, Glynn moved for judgment of acquittal and rested. He offered no evidence and did not cross-examine any witness subsequently called. Legatos put on a defense. The jury by its verdicts found each defendant guilty on each count. Thereafter the Court granted Glynn's motion for judgment of acquittal as to count one and denied it as to counts two and three. From judgments and sentences on the verdicts Legatos and Glynn appealed.

During the period covered by the indictment, appellant Legatos, a resident of Sacramento, owned numerous restaurants, bars and taverns in that city and

1. The record on appeal consists of 8 volumes, aggregating 3580 printed pages.

elsewhere in Northern California. In Vallejo, one of them, Hambers Cafe, was managed by appellant Glynn, and two others—the Casa Blanca and the States Club—were operated by a partnership consisting of Legatos, Glynn, and one John Blanas, who testified in the trial as a witness for the Government. During the war, Legatos' enterprises were very profitable, the gross receipts mounting to between $1,500,000.00 and $1,750,000.-00 annually for 1944, 1945, and 1946. In the Vallejo establishments substantial portions of the gross income were not rung up on the cash registers but were kept in the safe at Hambers Cafe and distributed monthly to the partners in currency in separate envelopes for each establishment. Such income consisted of monies from the juke boxes and coin machines, certain miscellaneous items, and receipts from private parties at the Casa Blanca on Wednesdays when it was closed to the general public. There was also evidence that part of the gross receipts of the Casa Blanca and States Club was concealed by "cutting" or manipulation of the tapes on the cash register machines. Tax returns of Legatos for the years 1942 through 1946 fell far short of disclosing his true income in those years. Amended returns, prepared by an accountant employed by him and filed in 1948, showed unreported income in the original returns amounting in the aggregate to approximately $244,000.00.

Appellant Legatos asserts nine specifications of error. We group and rephrase them as follows:

1) The sufficiency of the indictment;

2) Voluntary disclosure of tax liability by Legatos;

3) Admission of testimony of the witness Blanas;

4) Testimony of the witness Hubbard;

5) Sufficiency of the evidence to make a net worth case;

6) The instructions to the jury.

Appellant Glynn adopts all of Legatos' specifications of error and advances several of his own. They present, principally, the contention that, the evidence is not sufficient to support the verdict as to Glynn. We shall first discuss Legatos' specifications and then consider the contention urged by Glynn.

### (1) The Indictment.

■■ Prior to trial, Legatos moved to dismiss the indictment, and for a bill of particulars, and the motions were denied. He complains that he was not reasonably and fairly informed of the nature of the charges, or of the methods which the Government proposed to use to establish them. The indictment was in the form commonly used in tax prosecutions. The first count, which we take as typical, alleged that Legatos attempted to defeat and evade a large part of his income tax for the year 1944 by understating his partnership and business receipts and by filing a false and fraudulent tax return wherein he stated his net income to be $40,449.26, and that the amount of tax due and owing thereon was the sum of $20,903.47, whereas, as he well knew, his net income for that year, computed on the community property basis, was the sum of $71,607.75, upon which net income he owed the United States an income tax of $45,150.-51. The count sufficiently stated the essential facts constituting the offense charged.[2] And we find no abuse of discretion in the denial of the motion for a bill of particulars.[3] After the Government started to investigate Legatos' tax returns, he employed an expert accountant who worked on his books and records for many months in cooperation and collaboration with an agent of the Bureau of Internal Revenue. The accountant

---

2. Fed.Rules Crim.Proc. rule 7(c), 18 U.S. C.A.

3. Wong Tai v. United States, 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545; United States v. Skidmore, 7 Cir., 123 F.2d 604; Maxfield v. United States, 9 Cir., 152 F.2d 593; Himmelfarb v. United States, 9 Cir., 175 F.2d 924.

recomputed his income for the years in controversy on the net worth basis, and prepared amended income tax returns which were filed in 1948. Count one adopted the figures in the amended tax return as the correct net income and income tax of Legatos for the year 1944. The same is true of counts two and three as to the years 1945 and 1946. Legatos knew, or could easily have learned by making inquiry of his own accountant, the nature of the charges against him and, in general, the character of the evidence which the Government would use.

### (2) *Voluntary Disclosure.*

■ Legatos contends that he was immune from prosecution because of his voluntary disclosure of the understatement of his income and tax liability in compliance with an announced policy of the United States Treasury Department, which had not at that time been withdrawn.[4] Closely allied to that contention is the additional one that, documentary evidence used in his trial was procured from him by government agents after he had been misled into believing that no criminal action against him was contemplated, in violation of his rights under the Fourth and Fifth Amendments to the Federal Constitution. A taxpayer's rights upon a claimed acceptance of the Treasury Department's offer (considering it as such for the purpose of this discussion) can be no broader than the plain, express terms of the offer. Such terms were that the taxpayer make "a voluntary disclosure of omission or other misstatement in his tax return * * * before an investigation is under way * * * ." Legatos, with the assistance of an attorney, made a formal voluntary disclosure in the form of a let-

ter to the Bureau of Internal Revenue on July 9, 1947. Briefly and chronologically listed, the events leading up to that disclosure were as follows: November 20, 1946, the Bureau of Internal Revenue wrote to Legatos requesting an extension of time for the examination of tax returns, and consent to the extension was received November 24, 1946. On March 5, 1947, Internal Revenue Agent Bakkan, in the course of his investigation of Legatos' tax returns, called at Legatos' Sacramento office to examine his books. The examination was continued on March 7, and March 11, but on none of those days was Legatos present. On April 15, 1947, Bakkan again visited the Sacramento office and was introduced to Legatos by the latter's office manager as "the Revenue Agent that was working making the examination." Bakkan was then inspecting some books which were spread out on a desk before him and he told Legatos that he was making an examination of his income tax returns. Bakkan continued his work on the books in Legatos' office on April 16 and 17, 1947, and Legatos came in and out of the office from time to time.

On May 2, 1947, Special Agent Hubbard of the Bureau of Internal Revenue was assigned to investigate the Legatos case. On May 6, he interviewed Blanas (partner of Legatos and Glynn in Vallejo enterprises as stated above) and took a sworn statement from him on May 14. June 5, Legatos, on advice of an attorney, employed accountant Swigard, and on June 9, Swigard called on Bakkan and offered to cooperate with him fully and to furnish him detailed information of Legatos' financial affairs. June 13, Hubbard asked Glynn for books and records of the Vallejo establish-

4. The voluntary disclosure policy relied upon was stated by then Secretary of the Treasury, Fred Vinson in the Washington Post, August 21, 1945, as follows: "The Commissioner of Internal Revenue does not recommend criminal prosecution in the case of any taxpayer who makes a voluntary disclosure of omission or other misstatement in his tax return. Monetary penalties may be imposed for delinquency, for negligence, and for fraud, but the man who makes a disclosure before an investigation is under way protects himself and his family from the stigma of a felony conviction. And there is nothing complicated about going to a Collector or other revenue officer and simply saying 'there is something wrong with my return and I want to straighten it out.'"

ments and Glynn gave him some of them on June 16, and more within two weeks thereafter.

 From the foregoing recital, it is apparent that the voluntary disclosure made by Legatos on July 9, came long after investigation was under way, and was insufficient to afford him immunity from prosecution.[5] Legatos calls attention to his directions to his office manager and bookkeeper to furnish agent Bakkan any and all books and records he might request, and the conduct of his accountant Swigard in working in full cooperation with agent Bakkan; but aiding and facilitating a government tax investigation after it has been started manifestly does not bring the taxpayer within the Treasury Department's voluntary disclosure policy. Legatos further complains that he was misled into believing that only a routine, civil liability investigation was being made of his tax returns and that he was not informed until after his voluntary disclosure that criminal prosecution was contemplated. No case has been called to our attention which holds that, a taxpayer may obtain immunity by making voluntary disclosure of error or omission in his tax return at any time before a criminal investigation, as distinguished from a civil one, has been instituted. Usually, when an investigation is started, it is not possible to predict where it will lead or whether or not evidence of fraud sufficient to justify prosecution will be uncovered. In Bateman v. United States, supra, (footnote 5) this Court held that, after the collector had forwarded tax returns to a deputy collector with directions to initiate an investigation, a request by government agents that the taxpayers sign a waiver of statute of limitations upon assessment of income taxes (a civil liability), was sufficient to put them on notice that they were under investigation. It is our conclusion that Legatos' disclosure came too late. He did not go to the Government. The Government came to him. No government agent made any promise of immunity from prosecution to appellants, or gave them any good reason to believe that prosecution would not be instituted. And since appellant Glynn gave the challenged documentary evidence to a government agent before any effective voluntary disclosure had been made, no constitutional rights of appellants were violated. Bateman v. United States, United States v. Lustig, and United States v. Weisman, cited above in footnote 5.

### (3) *Testimony of Witness Blanas.*

 Legatos, in partnership with Glynn and Blanas, operated the States Club in Vallejo. Blanas, a witness for the Government, testified, over objection, regarding a conversation with Legatos in that establishment sometime during the year 1945. Blanas testified they discussed how they could get rid of the brandy and rum "that wasn't moving fast"; that Blanas said he would refill the bottles a few at a time and get rid of them; and that Legatos told him to be very careful and not to fill too many. The Court admitted the testimony for the limited purpose of showing "the connection of Mr. Legatos with the Club." It is now argued that, since it was not disputed that Legatos, as one of three partners, was part owner of the club, the testimony was not material to any contested issue and was prejudicial in that it tended to show commission by Legatos of an offense not charged in the indictment. Legatos did not question his being a partner in the States Club, it is true, but he did strenuously contend that he was not criminally liable for his partners' acts in connection with its operation in the absence of a showing of personal participation or knowledge on his part. Legatos' residence and main office were in Sacramento.

5. United States v. Lustig, 2 Cir., 163 F. 2d 85; Bateman v. United States, 9 Cir., 212 F.2d 61; Lapides v. United States, 2 Cir., 215 F.2d 253; United States v. Weisman, D.C., 78 F.Supp. 979; In re White, D.C., 98 F.Supp. 895; United States v. Levy, D.C., 99 F.Supp. 529.

There was evidence that he did not take an active part in the management or operation of the States Club and that he was seldom seen there. It was material and proper for the Government to show by the challenged testimony that Legatos personally participated in the operation of the establishment to the extent of aiding in the solution of the problem of disposing of slow-moving liquor stocks. Relevant evidence is admissible even though it incidentally shows commission by the accused of another crime.[6]

### (4) *Testimony of Witness Hubbard.*

Beltran C. Hubbard, an agent of the Bureau of Internal Revenue, testified at length as an expert witness for the Government concerning the books and records which Glynn had given him, and with reference to numerous tapes from the adding machines in Hambers Cafe, the Casa Blanca, and the States Club. The purport of his testimony was that the tapes had been cut and manipulated so that they did not show all of the receipts taken in through the machines. He voiced the conclusion that other receipts had been withheld from the books. It was the position of the Government that, since Legatos was a partner of Glynn and Blanas and they were shown to have been acting in concert, Hubbard's testimony was admissible against both Legatos and Glynn. The Court, however, rejected that theory and in the presence of the jury ruled that the testimony would be admitted only against Glynn, but remarked that the Government could again offer it against Legatos or move to have it apply to him later on in the trial. With some few exceptions, all of the evidence, both oral and documentary, offered by Hubbard was admitted on that basis. A considerable volume of other evidence was admitted as to Legatos only and, after both sides had rested, government counsel moved that all of the evidence be considered admitted against both defendants. The Court heard the argument of counsel and denied the motion in the absence of the jury. Legatos now complains that, the Court did not make it sufficiently clear to the jury that Hubbard's testimony for the most part was to be considered only against Glynn. In view of the large number of instances throughout the protracted trial in which evidence was admitted against one defendant and not against the other, and the number of documents and the volume of testimony involved, it would have been a Herculean, if not an impossible task, for the trial judge to give the jury detailed instructions as to just what evidence was to be considered against which defendant. During argument to the jury by Government counsel, when Legatos' attorney made the objection that, testimony of Blanas admitted only as to Glynn was being improperly applied to Legatos, the Court interrupted the argument to give the jurors a cautionary instruction to the effect that they should consider against each defendant only the evidence admitted as to that defendant.[7] The same instruction was again given to the jury in the Court's final charge. In the circumstances presented, that was about all the Court could do. Perhaps too much was expected of the jury, but the same may be said of almost every protracted jury trial involving complex issues and more than one defendant.

### (5) *Sufficiency of Evidence on Net Worth Basis.*

In his brief, Legatos argues that the evidence was not sufficient to warrant submission of a net worth case

6. Wharton's Criminal Evidence (11th ed.), Vol. 1, p. 486, § 343; United States v. Sebo, 7 Cir., 101 F.2d 889; Weiss v. United States, 5 Cir., 122 F.2d 675; Bracey v. United States, 79 U.S.App.D.C. 23, 142 F.2d 85.

7. The Court's instruction was as follows: "It may be difficult for you, when considering the case for or against any one certain defendant, to disregard completely any evidence that was admitted only as to another, but that is your plain duty with respect to evidence not admitted by the Court as against a certain defendant, you must try conscientiously to so treat such a situation."

to the jury for the reason that there was no showing that the taxpayer's books were incomplete or inadequate. On oral argument, Legatos' counsel announced that he was abandoning the contention. He could well do so without detriment to his client's interests. Both the government agent, Bakkan, and Legatos' accountant, Swigard, concluded that it was not feasible to calculate Legatos' income from his books and that it was advisable to use the net worth method. Swigard testified that it would take "a matter of maybe years" to completely audit Legatos' books for income tax purposes. A reasonable inference could be drawn that the books were incomplete and that substantial items of cash income were not entered therein. There was sufficient basis for employment of the net worth method of computation of Legatos' income.[8]

### (6) *The Court's Instructions to the Jury.*

 Legatos specifies as error the Court's omission to give his requested instruction that, in using the net worth method the Government had the burden of proving beyond a reasonable doubt the wealth of Legatos at the starting point of the net worth period. The Court in its instructions explained the net worth method and stated the circumstances in which it properly could be employed. The Court further fully and correctly instructed the jury as to the elements constituting the crime charged and informed the jury that the Government had the burden of proving every element of the crime beyond a reasonable doubt. It was not necessary for the Court to repeat his instructions as to the Government's burden of proof in explaining the methods of proof open to the Government. Here, particularly, there was no call for such emphasis in view of the fact that the wealth of Legatos at the starting point which the Government used was in accordance with the amended tax returns filed by Legatos

and sworn to be correct both by him and by his accountant.

Legatos also complains of the following instruction which the Court gave to the jury:

"The attempt to evade and defeat the tax must be a willful attempt. That is to say, it must be made with the intent to keep from the Government a tax imposed by the income tax laws which it was the duty of the defendant Legatos to pay to the Government. The attempt must be willful, that is, intentionally done with the intent that the Government should be defrauded of the income tax due from the defendant Legatos. The presumption is that a person intends the natural consequences of his acts, and with respect to the defendant Legatos, the natural presumption would be that if a person consciously, knowingly, and intentionally, with evil motive or bad purpose did not set up his full income and thereby the Government was cheated or defrauded of taxes, he intended to defeat the tax."

The contention that the instruction was prejudicially erroneous is based principally upon Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L. Ed. 288, and Wardlaw v. United States, 5 Cir., 203 F.2d 884. The instruction held to be erroneous in the latter case was as follows:

" 'The presumption is that a person intends the natural consequences of his acts, and the natural presumption would be if a person consciously, knowingly, or intentionally did not set up his income and thereby the government was cheated or defrauded of taxes, that he intended to defeat the tax.' " At page 887.

The Court reasoned that the intent, which is an element of the offense, is not inherent in the act itself but is a specific intent involving "bad purpose and evil motive". Wardlaw v. United States had

---

8. 26 U.S.C.A. § 41; Remmer v. United States, 9 Cir., 205 F.2d 277, 286.

been called to the District Court's attention in the course of the trial in this case, and it seems likely that in order to meet what he regarded as its requirements, he fashioned the instruction quoted above to read that, the jury might presume the intent if the accused consciously, knowingly, and intentionally, with "evil motive or bad purpose," did not set up his full income and thereby the Government was cheated or defrauded of the taxes. Legatos argues that the addition of the language from the Wardlaw case did not cure the error, since the vice of the instruction is not the language with which it may be clothed, but its submission to the jury of the presumption of guilt, condemned by the Supreme Court in Morissette v. United States, supra.

▆▆▆▆▆ In the Morissette case the defendant picked up some spent bomb casings on a government practice bombing range and was convicted of theft of government property. His defense was that he believed the casings had been abandoned and that he did not intend to steal them. The trial court in effect rejected the proffered defense and instructed the jury [342 U.S. 246, 72 S.Ct. 243]:

> "'That if this young man took this property (and he says he did), without any permission (he says he did), that was on the property of the United States Government (he says it was), that it was of the value of one cent or more (and evidently it was), that he is guilty of the offense charged here. If you believe the government, he is guilty. * * * The question on intent is whether or not he intended to take the property. He says he did. Therefore, if you believe either side, he is guilty.'"

Defendant's counsel contended that the taking must have been with a felonious intent, but the trial court ruled, "That is presumed by his own act". A considerable portion of the Supreme Court's opinion is taken up with a discussion of the question whether specific intent was an essential element of the offense charged. Having reached the conclusion that it was, the Court observed that the case was tried on the theory that "if criminal intent were essential its presence (a) should be decided by the court (b) as a presumption of law, apparently conclusive, (c) predicated upon the isolated act of taking rather than upon all the circumstances." The Court regarded each of the three assumptions, (a), (b), and (c), as erroneous. Where intent of the accused is an ingredient of the crime charged, it said, its existence is a question of fact which must be submitted to the jury, and the question may not be withdrawn or prejudged by instruction that the law raises a presumption of intent from an act. And a presumption which would permit but not require the jury to assume intent from an isolated fact, would prejudge a conclusion which the jury should reach of its own volition. The essence of the Morissette case, then, is that, the existence of criminal intent is a question of fact to be determined by the jury from all the attendant circumstances, and the jury should not be instructed that such intent must or may be presumed as a matter of law from an isolated fact.

On April 11, 1955, after the instant case was submitted, this Court decided Bloch v. United States, 221 F.2d 786. Based upon the authority of the Wardlaw and Morissette cases, it held that the giving of the following instruction constituted plain error which the court should notice on its own motion under Rule 52(b) of the Federal Rules of Criminal Procedure:

> "'The presumption is that a person intends the natural consequences of his acts, and the natural inference would be if a person consciously, knowingly and intentionally did not set up his income, and thereby the government was cheated or defrauded of taxes, that he intended to defeat the tax.'"

There the instruction in which the trial court defined the term "wilfully"

for the jury also was held to be erroneous.[9]

On the other hand, in Bateman v. United States, 9 Cir., 212 F.2d 61, 69, this Court came to the conclusion that an instruction in a tax evasion case that " 'the law presumes that every man intends the natural and probable consequences of his own voluntary acts' " was not prejudicially erroneous for the reason that, considered as a whole the trial court's instructions on intent "correctly stated the law, were plain and understandable, and left no room for doubt in the minds of the jurors."

We think the same reasoning may be applied to the instant case. In the first place, directly contrary to the trial court's position in the Morissette case, here the judge instructed the jury that, "The question whether, under the indictment, there existed an intent to defraud the government of the United States is solely a question of fact to be determined by the jury." The jury was also told that intent was an essential element of the crime; that it was to be determined by the jury from consideration of all the facts and circumstances in evidence; and that guilty knowledge and "specific wrongful intent" on the part of the taxpayer to evade payment of the tax must be established.[10]

It is our conclusion that, considered as a whole the Court's instructions on intent and wilfulness clearly and correctly

9. The instruction was as follows:

"Wilfully in the statute, which makes a willful attempt to evade taxes a crime, refers to the state of mind in which the act of evasion was done. It includes several states of mind, any one of which may be the willfulness to make up the crime.

"Willfulness includes doing an act with a bad purpose. It includes doing an act without a justifiable excuse. It includes doing an act without ground for believing that the act is lawful. It also includes doing an act with a careless disregard for whether or not one has the right so to act."

10. As to intent and knowledge, and the meaning of "wilful", the trial court instructed:

"Intent is an essential element in the perpetration of the offenses charged against the defendants in the indictment. Intent may be shown by proof of facts and circumstances from which it may be reasonably and satisfactorily inferred. In determining whether a defendant had such intent, you should take into consideration all the facts and circumstances in evidence, the acts and conduct of such defendant, and his motives, if any, disclosed by the testimony, for doing or not doing the act or acts charged in the indictment as shown by the evidence; and if from all the facts and circumstances in the evidence there is no other reasonable conclusion than that he is guilty, you should so find.

"One of the essential elements of the proof of attempt to evade income tax or the payment thereof is knowledge on the part of the taxpayer of the existence of the obligation; that is, of the tax due and a specific wrongful intent to evade the payment thereof. If you find from all the evidence that the defendant Legatos did not have actual knowledge of the existence of an obligation on his part to pay any income tax in addition to the income tax reported by him in his original income tax returns, and that said defendant did not have a specific wrongful intent to evade such obligation, then you should find the defendant Legatos not guilty.

"Fraud is an actual intentional wrongdoing and the intent required is a specific mental determination or purpose to evade a tax known or believed to be owing. Before you can convict the defendant Legatos, you must find from the evidence beyond a reasonable doubt that any income tax return involved in this indictment was not only false and fraudulent, but that by such false and fraudulent return said defendant committed an actual, intentional wrong-doing and that the filing of said return was with the intent on his part to evade a tax owing or believed to be owing to the United States.

"The word 'wilful' when used in a criminal statute generally means an act done with a bad purpose, but the word is also employed to characterize a thing done without ground for believing it is lawful, or conduct marked by disregard whether one has the right so to act.

"The word 'wilfully,' as used in this Statute, means more then [sic] intentionally or voluntarily, and includes an evil motive or bad purpose, so that evidence of an actual bona fide misconception of the law, such as would negative knowledge of the existence of the obligation would, if believed by the jury, justify a verdict for a defendant. It is for the jury to say whether a defendant had the requisite criminal intent, that is whether

stated the law and were not such as to mislead the jury. We conclude, therefore, that the present case is governed by Bateman v. United States, supra, and is distinguishable from Wardlaw v. United States, supra, and Bloch v. United States, supra, where the effect of the court's instructions considered as a whole was not discussed.[11]

### Sufficiency of the Evidence as to Glynn.

No conspiracy between the defendants was charged in the indictment and the District Court consistently ruled that concert of action between them was not established by the evidence. During the protracted trial, evidence was admitted on a separate, individual basis, and only evidence with which a defendant was shown to be connected was admitted against that defendant. Glynn rested at the conclusion of the Government's case in chief and the Court ruled that all evidence thereafter introduced, including the testimony of Legatos and his other witnesses was not admitted as to Glynn. The only evidence received against Glynn was the testimony of Blanas and Hubbard, which covered the operation and disposition of the receipts of the Vallejo establishments, and the partnership tax returns. The original and amended tax returns of Legatos, the net worth evidence, and other evidence that Legatos understated his income in his income tax returns, are not in evidence at all so far as Glynn is concerned. He is accused and convicted of wilfully attempting to defeat and evade a large part of the income tax due and owing by Legatos to the United States for the calendar years 1945 (second count) and 1946 (third count), but there is no supporting evidence which properly may be considered against him that Legatos had any taxable net income

in 1945 or 1946; or that Legatos in either of those years owed any Federal income tax. So far as the evidence against Glynn is concerned, Legatos may have filed returns in 1945 and 1946 in which he correctly reported his income and made timely payment of all of his tax due and owing to the United States. Glynn's conviction cannot stand without substantial evidence that he had the criminal intent stressed as essential in the Wardlaw and Bloch cases, to evade or defeat the payment of income tax which Legatos was obligated to pay the United States. The Government had the burden of proving that some income tax was due from Legatos for the years involved.[12] It did not carry that burden as to Glynn.

Appellee argues that the evidence is sufficient to support Glynn's conviction as an aider and abettor of an attempt to evade Legatos' income tax. That may have been the theory on which Glynn's case was submitted to the jury as the trial court gave an instruction to the effect that, persons who knowingly and with criminal intent aid and abet in the commission of an act constituting an offense, or who advise and encourage its commission, are regarded in law as principals and are equally guilty with those who directly and actively commit the offense. The evidence was not sufficient, however, to support conviction of Glynn as an aider and abettor. To justify conviction on that basis, it must appear that the offense charged was committed by someone other than Glynn. If no crime has been committed, no one can be convicted as an aider and abettor.[13]

There is no evidence admitted against Glynn that Legatos attempted to evade payment of his income tax.

Affirmed as to Legatos and reversed as to Glynn.

---

he wilfully and knowingly attempted to defeat and evade the income tax."

11. The Bateman case was not mentioned nor cited in Bloch v. United States.

12. Gleckman v. United States, 8 Cir., 80 F.2d 394, 399; United States v. Schenck, 2 Cir., 126 F.2d 702, 704; Rose v. United States, 10 Cir., 128 F.2d 622, 626;

United States v. Rosenblum, 7 Cir., 176 F.2d 321, 329.

13. 14 Am.Jur. 832, § 93; 22 C.J.S., Criminal Law, § 100, page 171; Yenkichi Ito v. United States, 9 Cir., 64 F.2d 73; Morgan v. United States, 10 Cir., 159 F. 2d 85; United States v. Horton, 7 Cir., 180 F.2d 427; United States v. Zerbst, D.C., 111 F.Supp. 807.