**UNITED STATES of America**

v.

**David PACK.**

**UNITED STATES of America**

v.

**Harry PACK.**

Crim. A. Nos. 757, 758, 837, 838.

United States District Court
D. Delaware.

March 16, 1956.

Leonard G. Hagner, U. S. Atty., H. Newton White, Asst. U. S. Atty., Wilmington, Del., George Willi, Special Asst. to the Atty. Gen., and Fred G. Folsom, Atty., Dept. of Justice, Washington, D. C., for plaintiff.

S. Samuel Arsht (of Morris, Steel, Nichols & Arsht), Wilmington, Del., for defendants.

RODNEY, District Judge.

This matter involves four criminal indictments against the defendants for having willfully attempted to evade their individual income tax liability for the years 1945 and 1946. Each of the defendants was indicted February 29, 1952 with reference to the income tax for the year 1945, and each defendant was indicted June 15, 1953 with respect to the income tax for the year 1946. Because, however, the present questions are common to all four indictments, they will be treated together.

The present questions arise from practically similar motions in all four cases to suppress the evidence obtained by the Government from the books, records and personal communications of the defendants. The records and communications were made available to the tax agents by the defendants and they insist it was done in compliance with a, so-called, "voluntary disclosure" policy of the Treasury Department, which policy in general terms allowed repentant taxpayers to disclose the incorrectness of their returns, before an investigation has been commenced, and with immunity from criminal prosecution.[1]

An extended hearing has been had upon the facts surrounding the claimed voluntary disclosure and separate findings of fact and conclusions of law have been filed.

 Now in a matter involving a false or fraudulent income tax evasion there may be involved a criminal liability, or civil or monetary liability, or both. Under the 5th Amendment to the Constitution, no person, *in a criminal case,* may be required to give evidence against himself. Consequently, in a criminal case the books and records of a taxpayer may not be used against a taxpayer against his will and without his consent. From this there grew up a policy of the Treasury Department which, in general, provided that a repentant taxpayer who made a voluntary disclosure of a fraudulent or erroneous tax return before the Government had commenced an investigation and who then cooperated with the Government in the disposition of the matter would be immune from criminal prosecution, though he might still be subject to civil liability.

Just when the policy of the Government as to voluntary disclosures first took form does not appear, but it apparently originated as a departmental policy with no public announcement. It is in evidence that on August 21, 1945 the Secretary of the Treasury publicly stated in part:

"* * * The Commissioner of Internal Revenue does not recommend criminal prosecution in the case of any taxpayer who makes a voluntary disclosure of omission or other misstatement in his tax return or of failure to make a tax return. Monetary penalties may be imposed for delinquency, for negligence or for fraud but the man who makes a disclosure before an investigation is under way protects himself and his family from the stigma of a felony conviction * * *"

On May 14, 1947, Mr. J. P. Wenchel, the then Chief Counsel of the Bureau of Internal Revenue, in a public address, reaffirmed the policy of the Government

---

1. The Court is informed the policy was abandoned January 10, 1952.

in cases of voluntary disclosure. Among other things he said

"\* \* \* the tax laws define two entirely different kinds of tax fraud. One is criminal. The other is civil. Of course a person may be guilty of both. But if you keep this distinction in mind you will be better able to understand the Treasury's policy of encouraging the repentant taxpayer to clear himself without criminal punishment even though he may be required to pay his taxes plus a civil money penalty for his fraud upon the government."

Speaking of the discretionary powers of the Treasury Department, he said:

"\* \* \* The Department acting under that power, does not recommend [to the Attorney General] prosecution of the evader who repents in time. There is nothing new in the position. For years the position of the Department has been that where the taxpayer makes a voluntary disclosure of intentional evasion before investigation has been initiated criminal prosecution will not be recommended."

"\* \* \* a voluntary disclosure occurs when a taxpayer of his own free will and accord, and before any investigation is initiated, discloses fraud upon the Government \* \* \*."

"\* \* \* An investigation is initiated when a Special Agent, an internal revenue agent, a Deputy Collector or other Bureau officer is assigned a return for examination or where an investigating officer has requested advice of appropriate officers of the Bureau with respect to the filing of a return or the payment of taxes \* \* \*."

On July 1, 1947 each of the defendants signed and sent to the Collector of Internal Revenue for the District of Delaware a letter as follows:

"Please be advised that within the near future I intend to file amended returns for the years 1943 to 1946, inclusive. I am doing this because I believe the returns which I filed for such years were incorrect and that in accordance with the policy of the Bureau, you will regard this letter, which indicates my intent to file amended returns as a voluntary disclosure.

"I have, at the present time, requested my accountant to prepare figures for the amended returns as quickly as possible.

"It shall be appreciated if the Bureau will make an examination of my amended returns just as soon as I have prepared and submitted them to you."

The Government denies that the letter may be considered as a "voluntary disclosure" within the expressed policy of the Department both (a) as to the timeliness of the disclosure and (b) the adequacy of the disclosure. Both of these questions must be determined from an unavoidable consideration of many facts, and many of these facts are applicable to both questions. Elaborate findings of fact and conclusions of law have been filed and only such facts will be here repeated as may be necessary to understand the conclusions reached.

The two defendants, Harry Pack and David Pack, together with a third brother, Michael Pack, were equal partners in three business enterprises concerning the growing and processing of chickens, and each was in charge of one operation as managing partner. Harry Pack managed "Harry Pack B. G. Co."[2] first at Milford, Delaware, and afterwards at Millsboro, Delaware; the remaining two enterprises, "Sussex Poultry Co.", at Milford, Delaware, and "Cranbury Poultry Co.", at Cranbury, New Jersey, were poultry dressing plants, the former managed by David Pack and the latter by Michael Pack.

In September 1945, the individual income tax returns of the present defendants and the partnership returns of the

2. B. G. indicating Broiler Growing.

Sussex Poultry Company and Harry Pack B. G. Company for the years 1943 and 1944 were assigned to Revenue Agents Stolper and Rice for examination. At the commencement of the examination an unusual occurrence is noted. Agent Stolper found two or three standard ledger sheets in the books of the Sussex Poultry Company which had vertical columns of figures with no identifying caption or definitive legend, and was unable to reconcile these figures with the remainder of the Company's records. Seeking some aid, he found all the personnel had gone to lunch. Placing a scrap paper marking the location of the unidentified sheets, he also went to lunch. Upon his return, Agent Stolper could not find the unidentified sheets and they were never seen or heard of again. Reference to this incident is made by me merely because upon it the Government places considerable emphasis of suspicion in connection with other matters appearing in the examination. In August 1946, the Agents completed their examination for the years 1943 and 1944.

At or about the time that Agents Stolper and Rice were engaged in the examination of the returns of the defendants and of the Sussex Poultry Co. and Harry Pack B. G. Company for 1943 and 1944, another agent in New Jersey was examining the returns of Cranbury Poultry Company and Michael Pack for the same years. For the years 1943 and 1944 the defendants had no income except as derived from the three partnerships as above-mentioned.

In August 1946 the New Jersey Agent completed his report for the Cranbury Poultry Company for 1943 and 1944 and was pressing the Delaware Agents for the reports of the two Delaware partnerships, in which Michael Pack had an interest, so he could complete the individual returns for Michael Pack.

In August, 1946, the Delaware Agents completed and submitted to the present defendants the proposed adjustment of the two Delaware partnerships for the years 1943 and 1944. This adjustment was approved by defendants on December 23, 1946, as evidenced by the execution of Treasury Form 875 provided for the purpose. At the same time, at the Agents' request, the defendants executed Treasury Form 872 which was an extension of the Statute of Limitations covering the 1943 return, as it was doubtful that such return could be completed in time. There is no evidence that any extension concerning the 1944 return was ever requested or executed. The adjusted returns for three partnerships were duly sent by the Agents to the partnerships and duly accepted.

As a result of the adjustments of the three partnership returns, the net income of each one was substantially increased and the personal liability of Michael Pack for years 1943 and 1944 was determined and paid.

The foregoing constitutes all the material facts concerning the partnerships in Delaware and New Jersey and bearing on the present question of the efficacy of the "voluntary disclosure".

The "voluntary disclosure" letters of July 1, 1947, it will be remembered, referred to the returns of 1943 to 1946, inclusive. No special agent had been assigned as to the returns of 1943 or 1944, and no agent of any description had been concerned with the returns of 1945 or 1946, the years covered by the present cases and present motions.

■ The Government contends in essence, that because it had commenced an examination of the returns for the years 1943 and 1944 prior to the voluntary disclosure letter of July 1, 1947 that, therefore, such examination was the "initiation of investigation" for the subsequent years of 1945 and 1946. This, I think, is not correct. It is well established that income tax liability for each year constitutes a separate transaction and an attempt to evade income taxes is a separate offense for each year.[3]

---

3. U. S. v. Stoehr, D.C., 100 F.Supp. 143, 159, affirmed, 3 Cir., 196 F.2d 276, 33 A.L.R.2d 836, certiorari denied 344 U.S. 826, 73 S.Ct. 28, 97 L.Ed. 643; U. S. v. Sullivan, 2 Cir., 98 F.2d 79; U. S. v. Johnson, 7 Cir., 123 F.2d 111, 119.

In Bateman v. U. S., 9 Cir., 212 F.2d 61, it was held that execution of Form 872, providing for extension of Limitations, was sufficient to put the taxpayers on notice that they were under investigation. This, however, would apply only to that year to which the extension referred and would not cover returns for future years. When the defendants executed the extension Form 872 on December 23, 1946, expressly limited to the 1943 return, the return for the year 1946 was not even due.

■ The Government, however, contends that since the "voluntary disclosure" letter of July 1, 1947 referred to the years "1943 to 1946 inclusive", that the efficacy of the letter must be considered as a unit and not applicable to the separate years. I can not bring myself to believe that it was necessary to file separate letters for each year, but believe that the letter may be efficient for the purpose for those years concerning which it may have efficacy and be inefficient for those other years when it may have no bearing.

I am of the opinion that if the foregoing matters concerning the examination of the returns of the defendants for 1943 and 1944, and the partnership returns in and near Delaware for the given years, constituted all the material facts, I would be compelled to grant the motions of the defendants.

The scene now shifts from the Delaware partnerships, as affecting the 1945 and 1946 returns of the defendants, and turns to New York.

For some time there had existed in New York a corporation known as Oak Valley Farm Products, Inc., whose business was the wholesale distribution of poultry in New York. In 1944 Harry Pack, one of the defendants, acquired 40% of the stock of Oak Valley and David Pack had 20%, and in 1946 a change of ownership occurred, and thereafter each of the two defendants owned 25% of the capital stock. For the fiscal year ending June 30, 1947, David Pack was President with an annual salary of $2,400 and Harry Pack was Secretary with a

salary of $1,850. It is not shown that they were at all active in the corporation's management. During the years 1945, 1946 and 1947, Oak Valley was one of Sussex Poultry Company's largest customers for that part of its product not taken by the Government.

On November 4, 1946, the income tax returns of Oak Valley for the fiscal years ending June 30, 1943, 1944 and 1945 were assigned for examination to a revenue agent of the New York Office. There is no suggestion that the agent knew of any connection of either defendant with the corporation. In the early part of 1947 the New York Agent was informed by another agent investigating tax returns of Henry Lustig and Longchamps Restaurant that the books of the latter taxables revealed a currency item of $30,-000 connected with Oak Valley, and this the New York Agent investigating Oak Valley did not find on the latter's books. Subsequently in June 1947, the agent investigating the affairs of Oak Valley received an anonymous letter mentioning the "Pack Brothers" with reference to Oak Valley, but without mentioning any specific ones—there being five Pack Brothers living at the time.

The New York Agent (Di Salvo) thereupon, on June 26, 1947, requested the services of a special agent in connection with the Oak Valley affairs.

■ This mention of the affairs of Oak Valley does not concern itself with any income received by the defendants from that corporation, for no suggestion is made that they did not fully report all such income. The sole reason for consideration of the affairs of Oak Valley is the effect of the examination of such Company on the letters of July 1, 1947 as "voluntary disclosure" concerning the personal returns of defendants for 1945 and 1946. A "voluntary disclosure", as heretofore indicated, to be effective, must have been made or offered before an investigation has been initiated. The question then is: Did the investigation of Oak Valley operate as an initiation of investigation concerning these defendants? I am of the opinion that it did not. It

may be readily assumed that where an individual transacts his personal affairs in corporate form and the corporation is to a greater or lesser extent his "alter ego", that then an investigation of one is the initiation of investigation of the other.

The Government strongly relies upon U. S. v. Levy, D.C., 99 F.Supp. 529, 532, as indicating that an initiation of investigation of the return of a corporation is a sufficient initiation of investigation as applicable to an individual. It must be noted, however, in that case, any remarks of the Court were predicated upon the statement, "It is true that Harlic [the corporation] is not a defendant herein, but beyond dispute Harlic [the corporation] was the vehicle through which the defendants had perpetrated their fraud and their fraud was such that a discovery of Harlic's participation in the fraud would necessarily lead to the uncovering of the defendant's participation." In the Levy case, supra, the Court discussed the requisites of the initiation of investigation as set out in the official announcement. Attention is drawn to the mention of "any" investigation. The word "any", as referring to the investigation, must have reference to the character or extent of the investigation, and not to an investigation having no reference or relationship to the party under consideration. So, too, the words referring to investigation "in the case" must have some reference to the party under consideration or the words lose all pertinency. Reiterating my view that initiation of investigation of a corporation owned or controlled by an individual, or used by him for the perpetration of fraud may be considered as the initiation of investigation of such individual, yet we must consider the facts as they here exist. Neither defendant was active in the management of Oak Valley. Both defendants have sworn that at the time of the letters of "voluntary disclosure" they did not know of any investigation of Oak Valley, and no direct testimony is shown to the contrary. Neither defendant, at the time, had more

than a 25% stock ownership of the corporation, and no intermingling of corporate and personal affairs is shown to exist. I cannot bring myself to believe that the initiation of investigation of the return of a corporation is, in effect and as affecting a personal voluntary disclosure, an initiation of investigation of a stockholder holding 25% of the stock. Since the percentage of stock ownership is not the criterion, the result might be to make such investigation applicable to the affairs of any stockholder even with a minimum of stock holding.

So far, I have considered the timeliness of the "voluntary disclosure". Many of the same facts are to be considered as to the adequacy of the letters. The letters of July 1, 1947 expressly stated that it was believed a mistake had been made and expressed an intention to file amended returns. The Government contends that no sufficient disclosure is offered by the letter and no amended return was, in fact, filed. The original statement of the Secretary of the Treasury speaks of "a voluntary disclosure of omission or other misstatement in his tax return * * *". The reaffirmation of the Governmental policy by Mr. Wenchel, Chief Counsel of the Bureau of Internal Revenue, speaks of a voluntary disclosure of "intentional evasion", and also states that "there is no special form for making the disclosure", but that "the simple statement that I have filed false tax returns and I want to make the Government whole" would constitute a complete disclosure.

In contending that there was no sufficient "disclosure" in the letters of July 1, 1947 as constituting a "voluntary disclosure" within the announced policy, the Government relies upon U. S. v. Feak, D.C.W.D.Wash. [unreported, but a copy of the opinion of June 9, 1954 being furnished me], Bateman v. U. S., 9 Cir., 212 F.2d 61, Application of Henry Lustig Co., D.C., 67 F.Supp. 306, and In re Monroe, D.C., 110 F.Supp. 507, Monroe v. United States, 5 Cir., 215 F.2d 81. These cases have all been examined but their facts seem materially different. In-

deed, in the Feak case it is stated to be sufficient " * * * to come forward and say in the words of Secretary Vinson 'there is something wrong with my return and I want to straighten it out'." That there is no requirement of explicitness in the disclosure is shown in U. S. v. Shotwell Mfg. Co., 7 Cir., 225 F.2d 394.

■ When the Government instituted the policy of voluntary disclosure, it did not adopt any form that the disclosure should take and it did adopt specific forms for countless other activities. It explicitly stated that "it was a simple thing" and "there is no special form for making the disclosure." The form adopted by the defendants, I think, was sufficient, as it clearly stated that the letter was intended as a "voluntary disclosure" and "in accordance with the policy of the Bureau."

The fact that the defendants did not file amended returns and the extent of the time which elapsed must receive consideration. These facts, however, must be considered with the surrounding facts. The letters of voluntary disclosure of the defendants were received at the beginning of July 1947. Shortly afterwards, in September 1947, the case jacket of the defendants' returns for 1943, 1944 and 1945 were delivered to Special Agent Lowenstein. Lowenstein had seen the letters of voluntary disclosure and visited the defendants in August 1947, and merely inquired as to when the amended returns, mentioned in said letters, would be filed. This was the first communication or visit the defendants had had from the Revenue Agents since November 1945. Mr. Lowenstein was told the records were in New York, where work was being done on the amended returns.

Two more years now pass and Special Agent Lowenstein has resigned from the Internal Revenue Bureau. In 1949, Agent Porcelli and Special Agent Mangano were assigned in connection with the returns of the defendants. Porcelli soon visited the defendants and learned the records were in New York. These records were subsequently returned to Delaware and examined by Porcelli and Mangano over a period of almost three years. The records almost filled a room twelve feet square. While the period of time the accountants of the defendants were working on the books seems a long one, it is in evidence that the work was complicated and extensive and diligently pursued. The Government, after the initial inquiry by Mr. Lowenstein in August 1947 as to when the amended returns would be filed, did not further press such filing. The Government itself took three years in its examination of the books. The only effect that the consumption of time in the filing of the amended returns has upon the letters of voluntary disclosure, it seems to me, lies in the cooperation with the Government in carrying out the purpose of said letters. This may be more fully shown by the turning over of all records to the Government, but such time has little to do with the adequacy of the letters themselves.

During the extended examination of the records by Agent Porcelli and Special Agent Mangano, they supplemented the information derived from the records by many personal interviews with the defendants, their accountants, employees and counsel. The Agents knew of, and had copies of, the letters of July 1, 1947, purporting to be letters of voluntary disclosure. The Agents knew that full cooperation with the Government was a necessary concomitant to a voluntary disclosure, and knew that the defendants were aware of such fact. The Agents at no time advised the defendants that the letters of July 1, 1947 would not be considered as letters of voluntary disclosure and, indeed, the Special Agent had an open mind until 1952 on the efficacy of the letters.

■ In U. S. v. Burdick, 3 Cir., 214 F.2d 768, 773, it is held as well settled that it is not essential to the admissibility of defendant's testimony that he should first have been warned that what he said might be used against him. The great proviso of the principle is stated in these words "providing that the defendant's statement ' * * * was entirely voluntary and understandingly given.' "

Was the testimony of defendants, furnished to the Government by the books, records and personal interviews "understandingly given"? I think not. Where books and records are laid open and personal interviews granted in accordance with an announced policy of the Government, that in such case there would be no criminal prosecution, and the Government knew at the time it examined books and records of the reliance upon that policy, I do not think the records etc. are understandingly given by the defendant or that the Government can use said records and information obtained from the interviews in exact opposition to the announced policy.

The most recent discussion of the nature and effect of a "voluntary disclosure" within the governmental policy is U. S. v. Shotwell Mfg. Co., 7 Cir., 225 F. 2d 394.[4] There the Court considered both the timeliness and adequacy of the disclosure with a result not inconsistent with the conclusions herein reached.

The Government claims that it is justified in having serious doubts and suspicions concerning the honesty and fairness of the actions of the defendants and their accountants and employees, and the records kept by or for them. The Government claims that the original episode of the missing papers in Milford, the connection with the Oak Valley Company and numerous smaller events and circumstances are sufficient to engender such suspicions. I am not, however, permitted to determine constitutional rights and legal matters from that viewpoint or upon that basis. The stark facts remain that the Government rightly or wrongly, and for reasons of its own, adopted and publicly announced a policy that a voluntary disclosure of mistake, omission or fraud made before an investigation has been initiated and followed by sufficient cooperation would exempt a person from criminal prosecution, although he would be liable for civil penalties. The defendants gave notice by letter of mistakes and expressly stated it to be a voluntary disclosure within the policy of the Government. This notice, I have felt compelled to hold, from a legal standpoint, both timely and adequate. The Government then with these letters before them, and knowing the reliance of the defendants upon their effect and with no repudiation but a tacit acceptance of such letters, culled the records over a three year period and then commenced criminal proceedings.

I feel compelled to say that the information obtained from such sources and under such circumstances was a wrongful obtention of evidence contrary to the 5th Amendment to the Constitution. I must, therefore, grant the motions to suppress such evidence. Of course, I am determining nothing as to any immunity from prosecution or as to the event of any trial. I am only determining that evidence obtained in violation of a Constitutional provision may not be used in a criminal case.

The motions to suppress vary somewhat in terms, but have been here treated together. The foregoing views are intended to relate to the personal books, records, correspondence or other papers belonging to either defendant for the years 1945 or 1946, or of evidence obtained by the agents as a result of the examination of such material by the governmental agents. They are also intended to relate to the books, records, correspondence or other papers of any partnership in which the defendant was a partner.

Evidently at some time about 1946, undisclosed in the record, the Partnership, "Sussex Poultry Co.", became incorporated and David Pack became President thereof. The foregoing views are not intended, unless explicitly mentioned at a later date, to apply to the books of such Corporation. See Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L. Ed. 771.

Appropriate orders may be submitted.

4. Certiorari applied for October 17, 1955 and not yet disposed of. 76 S.Ct. 1045.